In re Lawrence D. GOLDBERG, Debtor.

Dwayne M. Murray, Trustee, Plaintiff,

v.

Mae M. Stacy Trust and F. Eugene Richardson, Defendants.

Bankruptcy No. 94–10885.
Adversary No. 95–1020.

United States Bankruptcy Court, M.D. Louisiana.

May 1, 2002.

Dale R. Baringer, Baton Rouge, LA, for plaintiff.

Laura C. Poche, John Housan Fenner, III, Baton Rouge, LA, for F. Eugene Richardson.

David S. Rubin, for Boatmen's Trust Company.

## RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

### Background

This adversary proceeding, brought by the Chapter 7 trustee of the Lawrence D. Goldberg (Goldberg) bankruptcy estate, seeks avoidance of a prepetition purchase of a house from the Mae M. Stacy Trust (the Stacy Trust), pursuant to 11 U.S.C. § 548 and § 544(b), and recovery, under 11 U.S.C. § 550, of a $45,000 non-refundable deposit or down payment. The Goldberg trustee alleges that the transfer should be avoided under 11 U.S.C. § 548(a)(2) because it was made while Goldberg was insolvent and provided Goldberg with less than reasonably equivalent value for what was paid. Alternatively, the Goldberg trustee asserts that by use of the Louisiana revocatory action, pursuant to the power provided by 11 U.S.C. § 544(b), the transfer should be avoided, and the $45,000 payment recovered because the transfer and payment "caused or increased the obligor's (Goldberg's) insolvency."

Before the Court is the Request by the Stacy Trust for reconsideration of a judgment rendered against it and F. Eugene Richardson. For reasons set forth herein, the Court denies the reconsideration and reaffirms its prior judgment.

### Jurisdiction

The Court has original jurisdiction over this proceeding and had original jurisdiction of the adversary proceeding pursuant

to 28 U.S.C. §§ 1334(b) and 157(a), and the blanket referral by the Honorable District Court for this district of all cases under Title 11 and all proceedings arising in a case under Title 11, arising under Title 11 or related to a case under Title 11.

Before moving on to completion of the jurisdictional discussion, some background concerning this and other adversary proceedings is warranted. By the original complaint the defendants named were the Stacy Trust and Richardson, with the complaint being somewhat vague about the capacity in which Richardson was named. Prior to the initial scheduling conference, an answer was filed on behalf of the Stacy Trust and Richardson by Crawford & Lewis, acting as counsel for the Stacy Trust by virtue of being retained by Richardson, who was the co-trustee. In the original answer, the jurisdictional allegations (which did not comply with Rule 7008(a) but did allege jurisdiction under Sec. 1334(b); 157(b)(2)(H); 11 U.S.C. Sections 548, 550(a); and Bankruptcy Rule 7001), were admitted.

By the scheduling conference, the trustee had retained special counsel who advised of the intention to amend the complaint to specify jurisdiction, to add an action under 11 U.S.C. § 544(b), to clarify the capacity in which Richardson was named,[1] and to add the co-trustee of the Stacy Trust (Boatman's Trust Company of Arkansas, f/k/a Worthern National Bank of Arkansas) as a party defendant.

Pursuant to Rule 7008(a), Federal Rules of Bankruptcy Procedure, the Goldberg trustee, within its amended and restated complaint, consented to the entry, by this Court, of a final judgment.

After the filing of the Amended and Restated Complaint, it came to light that Boatman's Trust Company of Arkansas (Boatman's) and Richardson had fallen out and were involved in long-standing litigation in Arkansas State Court over, *inter alia*, breach of fiduciary duty by Richardson, whether Boatman's could remain as co-trustee, whether Richardson should be forced to resign as co-trustee, whether Richardson was liable to the Stacy Trust for damages, *etc.*

Primarily as a result of the Arkansas litigation, Richardson, individually, had filed a Chapter 11 petition in this Court, after the filing of the Amended and Restated Complaint herein. As a result of the filing of Richardson's own bankruptcy case, this adversary proceeding hit a momentary snag, made more snagged (or is it snaggedly) by the addition of Boatman's (the co-trustee) as a party defendant.

As a result of the aforementioned falling out, Boatman's disputed the capacity of Richardson to act (solely) for the Stacy Trust through counsel of his choosing, and moved to substitute counsel, at least as far as Boatman's, in its capacity as co-trustee, was concerned. Notwithstanding Richardson's assertion that he had the right (as tie-breaking co-trustee) to determine what lawyer could represent Boatman's, this Court granted Boatman's request to retain its own lawyer.

In addition to granting Boatman's the right to retain its own lawyer, the Court issued an Order granting the Goldberg trustee relief from the § 362 automatic stay to proceed with the adversary proceeding, as filed, as opposed to instituting a separate proceeding within the Richardson bankruptcy case. Once this smoke

---

**1.** The original complaint mentioned that Goldberg had been induce (sic) to purchase the property at higher than its known value, which smacked of the suggestion of actual fraud, but at the conference it became clear that actual fraud was not to be the ground of the avoidance assertion.

cleared, Richardson had two sets of lawyers (one in his capacity as co-trustee and one individually) and Boatman's had separate lawyers.

In his answer to the Amended and Restated Complaint, Richardson, in is capacity as co-trustee of the Stacy Trust, admitted the trustee's amended jurisdictional assertions, thereby consenting to the issuance of a final judgment by this Court. Boatman's, however, in its answer (in the capacity as co-trustee) asserted that "Boatman's denies that this Court has jurisdiction over Boatman's". Though this assertion appeared to deny personal jurisdiction, this Court concluded that counsel for Boatman's was far too experienced and expert to make such a wayward suggestion, and therefore treated the denial as not consenting to the issuance of a final judgment by this Court (which, as this Court understands it, is a matter of subject matter jurisdiction). Richardson, in his individual capacity, consented to the issuance by this Court of a final judgment.

Subsequently, Boatman's jurisdictional concerns dissolved, as it consented to this Court issuing a final judgment in all matters raised against Richardson within the Arkansas litigation. The actions against Richardson, individually and as co-trustee, initially arose within this adversary proceeding by means of cross-claims and answers thereto which were severed, given separate adversary proceeding numbers within the Richardson bankruptcy case (which, by the way, was fairly quickly converted to a Chapter 7 case). These other

proceedings have been tried, with consent of Boatman's to issuance by this Court of final judgments.[2]

Back to this adversary proceeding. The Court concludes, after reviewing the proceedings leading up to this opinion, including argument of the motions for summary judgment, that the objection to this Court's exercise of final authority jurisdiction was waived by Boatman's. Additionally, however, the Court notes that the Stacy Trust filed a proof of claim in the Goldberg case and, as well, moved for relief from stay on account of its second mortgage position upon the house at issue. The filing of the proof of claim converts this adversary proceeding to an equitable proceeding. *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989); *Langenkamp v. Culp*, 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). While the Supreme Court has determined that absence of right to jury trial without addressing the question of this Court's final authority jurisdiction in absence of a jury trial right, this Court concludes that it has final authority jurisdiction by virtue of the fallout from the Stacy Trust having filed a proof of claim (converts the proceeding to one in equity) and having moved for relief from stay (waiver, possibly), and by virtue of practically waiving any jurisdictional constraint to moving forward on all issues involving Richardson's actions, individually and as co-trustee, with respect to the Goldberg house business.

---

**2.** Of course, the claims against Richardson and the dischargeability actions against him were subject to the final authority jurisdiction of this Court. Of as much interest to Boatman's was the action to remove Richardson as co-trustee of the Stacy Trust, which this Court, with agreement of all parties (including the Richardson Chapter 7 trustee) concluded was related to the Richardson bankruptcy case given Richardson's remainderman interest in the Stacy Trust and the possibility of administration thereof by the Chapter 7 trustee, and that administration by the Richardson trustee, if found to be property of the bankruptcy estate, could conceivably be affected by the answer to the question of whether Richardson should remain as co-trustee.

At hearing on the cross-motions for summary judgment, the Court ruled that the portion of the Goldberg trustee's complaint asserting avoidance and recovery under 11 U.S.C. § 548(a)(2) should be dismissed, but reserved ruling upon the § 544(b) action. The trustee has mounted no assertion of actual fraud or intent to hinder or delay on the part of any of the defendants, and the parties agreed that no material issues of fact remained which required trial. While the Court found that the transfer could not be avoided under § 548(a)(2), Goldberg having received "reasonably equivalent value" as the phrase is construed within § 548, the Court requested briefs from the parties as to the possibility of recovery under § 544(b) through utilization of the Louisiana Revocatory Action.

Article 2036 of the Louisiana Civil Code sets forth the Louisiana Revocatory Action, and provides:

**Art. 2036. Act of the obligor that causes or increases his insolvency**

An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or increases the obligor's insolvency.

As will be shown, there was stipulation by the parties of insolvency on the part of Goldberg at the time of the complained-of transfer, and, as well, a stipulation for purposes of the § 544(b) action, of the value of the property purchased by Goldberg. Though the defendants raise various defenses to the § 544(b) action of which the Court will initially and quickly dispose, the true contest concerns whether the Louisiana Revocatory Action, as opposed to all other states' laws regarding avoidance of fraudulent transfers, allows avoidance of a transfer and recovery on a dollar-for-dollar basis, corresponding to the amount by which the debtor's insolvency was increased (as the trustee argues), or whether (as the defendants argue) the phrase "increases the obligor's insolvency" is not to be read literally but should be interpreted as requiring, as a first hurdle to be cleared in the quest for avoidance, proof that the obligor received less than reasonably equivalent value or, maybe, fair consideration for the transfer. The defendants argue that this Court should look to the Bankruptcy Code (less than reasonably equivalent value made while insolvent or which caused insolvency) or the Uniform Fraudulent Conveyance Act(s), as adopted by states other than Louisiana for guidance in gleaning the analytical necessity of a threshold lack of reasonable or fair equivalency for damage to have been occasioned by the transfer. However, by using Louisiana state law methods of statutory construction, by analyzing the Louisiana Revocatory Action in light of other state laws dealing with avoidance of fraudulent transfers, and after determining that the Bankruptcy Code does not supplant the relevant state law with any overriding federal law or equitable principle, the Court finds that the Louisiana Revocatory Action, through § 544(b), can be used to avoid a transfer and obtain recovery to the extent a debtor's insolvency is increased, on a dollar-for-dollar basis to the extent of the increase in insolvency without the necessity of proving receipt of less than reasonably equivalent value as a threshold condition for avoidance. Neither the Court nor the parties has found any cases on this precise issue, and, therefore, the Court faces this issue as one of first impression for a Louisiana court, state or federal. However, we think that the matter is of first impression not because of the complexity of the analysis or arguments, but because of the conference of two barely conceivable occurrences:

1. Counsel for the Stacy Trust, led by (local) counsel for Boatman's stipulated to the lowest arguable value of the real property in question, ignoring and affirmatively disagreeing with the Court's observation that a trial on the question of value of the property should take place and could take place in about one and one-half hours.[3]

2. After stipulating to a value of the property that was $63,000 less than the amount paid by Goldberg, and stipulating to Goldberg's insolvency at the time of the transfer, the Stacy Trust (again led by (local) counsel for Boatman's) argues that state law other than Louisiana law should provide the analytical guide to interpreting an unambiguous Louisiana statute in a way that is contrary to the language of the Louisiana statute.

### Findings of Fact

This avoidance action involves the purchase by the debtor, Dr. Lawrence Goldberg ("Goldberg"), of immovable property with improvements described as Lot 19, Block 1 of the McCall Subdivision, and having a municipal address of 1611 East Lakeshore Drive, Baton Rouge, Louisiana (the "Goldberg Property" or the "Property"). On August 21, 1993, Goldberg agreed to a lease of the Property with an option to purchase the Property for $265,000. Upon execution of the lease, Goldberg tendered a $45,000 non-refundable cash payment, which was to be applied toward the purchase price upon exercise of the option to purchase. As of the date of this agreement, there was a first mortgage on the Property in favor of Ford Consumer Finance, Inc. (Ford) in the approximate amount of $125,000. Thereafter, Goldberg advised of his intention to exercise the purchase option.

On December 14, 1993, Richardson and his wife, Nancy W. Richardson, transferred the Goldberg Property to the Stacy Trust, by act of Boatmen's and Richardson, as Co-Trustees, for the stated price of $176,718.64, payable by assumption by the Stacy Trust of the Ford mortgage in the amount of $124,218.64 plus $52,500 cash. On December 16, 1993, the Stacy Trust transferred the Property to Goldberg for the price of $265,000. The Ford first mortgage was refinanced, and a substituted first mortgage in the amount of $125,053.55 was executed by Goldberg on behalf of Ford. The Trust financed, by means of a second mortgage, the amount of $96,047.45, with the remainder of the purchase price and attributable costs being borne by the $45,000 cash payment.

In June, 1994, Goldberg defaulted on the loan from the Trust, and on August 5, 1994, Goldberg voluntarily filed a Chapter 13 petition in this Court. On September 16, 1994, the Court converted Goldberg's bankruptcy to one under Chapter 7 of the Bankruptcy Code.

On December 2, 1994, Ford filed a motion seeking relief from the automatic stay to allow it to foreclose upon the Property. The two mortgages were mentioned as encumbrances, less only a minor reduction in the first mortgage. Though the value recited in the action (the debtor's scheduled $265,000) indicated some equity, there was no objection or answer by the Goldberg trustee to the motion, and on January 25, 1995, this Court entered an Order granting Ford relief from the automatic stay. Quickly thereafter, on February 1, 1995, the Stacy Trust filed a motion seeking similar relief from the automatic stay and an expedited hearing upon the motion. An Order granting the expedited hearing was signed on February 1, 1995, and noticed to all parties. The debtor Goldberg, through counsel, objected to the

---

**3.** *See* transcript of hearing, P–88, pp. 28–30.

expedited hearing and to the requested stay relief, primarily on the basis that:

The Debtor and the Trustee are concerned that given the assertions by the moving creditor that they hold a valid and secured mortgage, that relief from stay may preclude or estop the Trustee or Debtor from asserting a claim against the moving creditor. The Debtor, therefore, opposes the relief requested.

(*See* Opposition and Answer to Motion for Expedited Hearing and Motion to Modify Automatic Stay and, Alternatively, for Adequate Protection ¶ 7, pleading 24, in the Goldberg bankruptcy case 94–10885, filed February 3, 1995.)

Additionally, the Goldberg trustee, on February 3, 1995, filed a Motion for Reconsideration of the Lifting of the Automatic Stay and in the Alternative for Supplemental Stay. The Goldberg trustee asserted the rather confused basis for his request that due to the existence of an avoidance action (recited to be bringable under § 548 and, maybe, § 544(b)), the Court should both reconsider its order granting Ford relief from the stay and deny the request of the Stacy Trust for similar relief "because there will be equity in the lakeshore property provided the alleged second mortgage held by Worthern Bank & Trust Company, N.A. as to co-trustees of the Mae M. Stacy Trust ... is avoided." (See paragraph 4 of this Motion, pleading 26). The trustee goes on to assert the concern that the avoidance action (yet to have been filed) might be prejudiced if relief from stay was obtained by the Stacy Trust.

The expedited hearing was deemed a preliminary hearing and, with the consent of the parties, the motions were continued to March 17, 1995. The Stacy Trust's supplemental memorandum in support of its request for relief from stay talks long and hard about the trustee not having

objected to the Ford allegation of lack of equity and suggests that, because lack of equity was the only basis for the requested relief from stay, the trustee's motion had no merit. By his supplemental memorandum, the Goldberg trustee reiterated his concern that the avoidance action might be prejudiced by foreclosure and that the property should remain property of the estate given the prospect of the avoidance of the second mortgage. As well, the Goldberg trustee referred to an adversary proceeding asserting the avoidance right, which was filed March 16, 1995 (and which instituted this action).

In summary, the arguments at the preliminary and final hearings revealed that after the order granting relief from stay for Ford, the trustee, after discussions with counsel for Goldberg, decided to investigate the prospect of an avoidance action and decided that relief from stay and foreclosure might somehow prejudice the estate's right to avoid the transfer. This concern was rooted in a misconception about how the avoidance action would work. In his remarks to the Court, the Goldberg trustee made clear his understanding that a successful avoidance action would avoid the Stacy Trust note and mortgage, thereby freeing up "equity" for the estate, which would continue to own the property. Counsel for the Stacy Trust, at the preliminary hearing, iterated her position that the finding of no equity underlying the grant of relief to Ford could not be disturbed. Counsel also remarked that she had no problem with "a reservation of any rights which the debtor, the debtor's attorney, or the trustee may have at this current time against the Trust."

Notwithstanding the Goldberg trustee's concern with the possibility of prejudice, the Court denied his request to reconsider and/or to issue a "supplemental stay" and

granted the Stacy Trust relief from stay.[4] The problem with the Goldberg trustee's position, as pointed out by the Court at argument, was that he wanted to have the proverbial cake and the benefit of eating it too. The thrust of his opposition to stay relief, that avoidance of the Stacy Trust note and mortgage would free up equity for the estate, was just plain wrong. The ultimate goal of the avoidance action (under either § 548(a) or § 544(b)) is to avoid the entire transfer—the sale from the Trust to Goldberg. Avoidance of the sale would have the initial consequence that the property would cease to belong to the estate and, secondly, that the obligation under the note to the Trust would be avoided. Avoidance of the debt results in the novation of the mortgage, which depends upon the primary obligation for its existence.[5] Therefore, the trustee, though likewise to be concerned about the possibility of prejudice lurking behind the foreclosure tree, did not quite understand that he could not avoid the transfer (the sale of the property) and keep the property. There will be more on this later (in response to the initial round of defenses raised by defendants), but it suffices to finish up here by saying that the court concluded that the Goldberg trustee would not be prejudiced by denying his motion for reconsideration of the Ford order or by granting relief to the Stacy Trust. In fact, the ultimate objective, found the Court, could be even better facilitated, assuming (correctly, it is hoped) that the Goldberg trustee misunderstood that "losing" the property was a necessary component of the avoidance result, because tender of the property could be quickly made (which would provide the Stacy Trust with its part of an avoidance result) leaving only the $45,000 cash payment hanging in limbo. Finally, the Court hopefully convinced the Goldberg trustee that as avoidance of the sale was to be his ultimate goal (and avoidance had to be grounded in some variance between the value of the property and what was paid), the Goldberg trustee could not argue that equity in the property for the estate was even conceivable.

After the denial of the Goldberg trustee's reconsideration request and the order granting relief to the Stacy Trust, Richardson, individually, filed a voluntary bankruptcy case in this Court.[6] Within this bankruptcy case, Ford, out of an abundance of caution one supposes, filed a motion seeking relief to foreclose its mortgage interest in the Goldberg property.[7]

---

**4.** The Court pointed out at argument that it had not researched the necessity of separate relief to the second mortgage position. In fact, as of these hearings, the Stacy Trust professed to be in negotiations with Ford about purchasing the mortgage note. Certainly, no additional stay relief would have been necessary to allow the second mortgage holder to foreclose as holder of the first mortgage as well, should the purchase have been effected.

**5.** Under Louisiana law, the mortgage would also be extinguished by "confusion" upon the Stacy Trust obtaining the property back. *See* La.C.C. Art.1903, which provides that unless "the qualities of obligee and obligor are united in the same person, the obligation is extin-guished by confusion." Upon transfer of the property back to the Stacy Trust upon avoidance of the transfer, the Stacy Trust would become both obligee and, as owner of the property, obligor under the mortgage. Thus, extinguishment by confusion.

**6.** See mention of this filing in "Jurisdiction" section. The case number was 95–10607, In re Floyd Eugene Richardson, Debtor.

**7.** Out of an abundance of caution, given that the only personal interest that Richardson could have had in the property would have arisen from his remainderman interest in the Stacy Trust. This motion is mentioned only to round out the story. See pleading # 4, filed June 13, 1995.

Subsequently, on June 20, 1995, the Goldberg trustee sent a letter to the co-trustees of the Stacy Trust offering a tender of the estate's interest in the property as a facet of a full resolution of the avoidance action or, alternatively, offered a tender with reservation of its rights to proceed on its avoidance action (along with a request that the Stacy Trust acknowledge the reservation).

On July 20, 1995, this Court issued an order pursuant to a request by all representatives of the Stacy Trust and two lawyers for Richardson, individually, for an emergency status conference, lifting the automatic stay so that all parties to the Arkansas litigation could request from the Arkansas Chancery Court direction as to whether the Stacy Trust could protect its second mortgage and/or ownership position by bidding on the Goldberg property once put up for sale in connection with the Ford foreclosure.

On or about July 26 or July 28, 1995, the Goldberg property was sold at sale (conducted by the East Baton Rouge Parish Sheriff's Office) to a third party, without a bid by the Stacy Trust.

By Motion for Summary Judgment, defendants seek dismissal of the Goldberg trustee's complaint on several grounds. In addition to the aforementioned recitation of facts, defendants' motion and statement of undisputed material facts sets forth the following concerning valuation of the property.

1. On or about August 4, 1993, the Goldberg property was appraised by Daniel D. Carlock as having a market value of $265,000.

2. On or about November 22, 1993, the same Daniel D. Carlock appraised the property as having a market value of $235,000.

3. As of June, 1994, the property was appraised by John R. Powell as having a market value of $235,000.

4. On July 14, 1995, Norbert F. Schexnayder, Jr. issued an appraisal of the Goldberg property, as of December 16, 1993 (the date of the sale from the Stacy Trust to Goldberg), as having a market value of $202,000.

Further, the parties stipulated that Goldberg was insolvent as of the dates of the lease with option to purchase, the payment of the $45,000 non-refundable deposit/down-payment, and the purchase of the property. Further, the Court takes judicial notice of the claims register in the bankruptcy case and the absence of issue raised by the parties as to whether a creditor holding an allowed unsecured claim could have pursued the revocatory action pre-bankruptcy, and finds that this requirement of § 544(b) is met.

### The § 548 Action

The § 548 portion of the Goldberg trustee's complaint, as amended, seeks avoidance of the purchase of the house and recovery of the $45,000, on the basis of § 548(a)(2).[8] At argument, counsel for the

---

**8.** Section 548(a)(2) provides as follows:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
***

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any proper-

trustee requested that summary judgment be denied or at least continued as the deposition of the debtor Goldberg had not yet been taken. Upon questioning by the Court as to what light Goldberg might shed on the proceeding, counsel for the trustee posed only the prospect of eliciting facts relevant to § 548(a)(2)(B)(ii) and/or (iii), that the trustee intended to show that after purchase of the house, Goldberg might be shown to fit into the "unreasonably small capital remaining or incurring debts beyond his ability to pay" categories. The Court denied the request.

Subsection 548(a)(2)(B) represents the second of two conjunctive prongs necessary to establish constructively "fraudulent" (and therefore avoidable) transfers. The subsections 548(a)(2)(B)(i), (ii), and (iii) are disjunctive alternatives, any one of which, if proved, will establish the second necessary prong. However, the first prong of § 548(a)(2) is that the debtor must have received "less than a reasonably equivalent value in exchange for such transfer or obligation." If the complaint cannot show receipt of less than reasonably equivalent value, there is no resort to the second prong.

█ As mentioned, the trustee proceeds upon § 548(a)(2), the constructive fraud provision. To establish an avoidable transfer under § 548(a)(2), the complaint must bear a two-pronged burden—establishing that the debtor received less than a reasonably equivalent value *and* that the transfer was made while insolvent or caused insolvency, resulted in unreasonably small capital *or* was made while the debtor intended to incur debts beyond his

ability to pay. The three subsections of § 548(a)(2)(B) are alternatives to one another, any one will satisfy prong two. However, if the plaintiff cannot establish receipt of less than reasonably equivalent value, insolvency is irrelevant, as neither prong can stand alone. Given the stipulation of the parties as to Goldberg's insolvency as of all relevant dates, foray into the possibility of fitting Goldberg (as of the date of the transfer) into one of the other subsections of § 548(a)(2)(B) would have been, at best, cumulative, but in reality, a waste of time. Insolvency satisfies subsection (B). The trustee offered no suggestion that Goldberg could add anything to the issue of whether he received less than reasonably equivalent value and conceded that there were no issues left to try on that first prong, unless the Court wanted to hear appraisal testimony.

Defendants urge by the motion that there are no issues to try under § 548, as even if the trustee's appraisal ($202,000) is found to represent the fair market value of the property as of the date of sale, Goldberg got reasonably equivalent value for what he gave. The trustee responds that the Court must fix the fair market value of the property and suggests that insufficient facts concerning the circumstances surrounding the sale have been made applicable for utilization of summary judgment on the reasonably equivalent value issue.[9]

### Reasonably Equivalent Value Under the Bankruptcy Code

Before determining whether a debtor received less than reasonably equivalent

---

ty remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond *the debtor's ability to pay as such* debts matured.

(A paragraph has since been added, but there is no substantive change.)

9. Though see the above discussion of the argument of counsel for the trustee about just what the Goldberg deposition was, in fact, supposed to flesh out.

value, the trial court must figure at what reasonably equivalent value is (or would have been in the particular circumstance). Within the Fifth Circuit, bankruptcy courts used to have the security blanket of *Durrett v. Washington infra. Durrett*, as all but the unborn know, included a foreclosure sale where the price paid by the creditor was some 57.7% of the fair market value of the property. The sale was subsequently attacked by a the bankruptcy trustee of the estate of the party against whom the foreclosure action was brought. The *Durrett* court, finding the matter before it distinguishable from the cases referred to the court by the parties in that it involved the sale of one parcel of real estate, referred to only one case, *Schafer v. Hammond*, 456 F.2d 15 (10th Cir.1972) (wherein the transfer of real property for corporate stock found to be worthless and, thereafter, to a subsequent trustee for approximately 50% of market value was avoided—in a private as opposed to foreclosure sale), before espousing what came to be known as the *Durrett* Rule:

> We have been unable to locate a decision of any district or appellate court dealing only with a transfer of real property as the subject of attack under section 67(d) of the Act, which has approved the transfer for less than 70 percent of the market value of the property.

*id.* at 203.

What did the *Durrett* Rule mean? Clearly, it was applicable to real estate foreclosure sales. Also, given the citation to *Schafer v. Hammond*, the applicability to the Rule to non-foreclosure, or private real estate sales, was direct. But was the "*Durrett* Rule" a rule?

Recently, the Fifth Circuit, in the *Matter of Fairchild Aircraft Corp., infra*, 6 F.3d 1119 (5th Cir.1993) referred to the *Durrett* Rule as dictum, but abjured the notion that *Durrett* established any sort of binding benchmark, or rule.

In *Durrett* we held that receipt of 57.4% of the consideration given could not constitute reasonable equivalent value, but implied in dictum that receipt of 70% might constitute such value. *Durrett*, 621 F.2d at 203. Many bankruptcy courts have construed *Durrett* as espousing a mechanical test with a 70% cut-off point, although this is clearly incorrect. *See, In re Besing*, 981 F.2d [1488,] at 1495 n. 14 [(5th Cir.1993)] (noting same); *FDIC v. Blanton*, 918 F.2d 524, 531 n. 7 (5th Cir.1990) (same). Other circuits have rejected any mechanical test to ascertain the lower limit of reasonably equivalent value, opting instead for a "totality of circumstances" approach. *In re Besing*, 981 F.2d at 1495 n. 14.

*Matter of Fairchild Aircraft* at 1126 n. 7.

But were courts who applied such a mechanical test to sales of real estate "clearly incorrect"? The cited case, *Matter of Besing* and *FDIC v. Blanton* do refer to the *Durrett* Rule as dicta, but with dissimilar emphasis on the "dicta as opposed to Rule" notion. In *Besing* the court, dealing not with a sale of real estate but with the question of whether dismissal of a claim as a component of a settlement constituted a transfer for less than reasonably equivalent value referred to *Durrett*:

> In *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201 (5th Cir.1980), for example, a panel of this circuit applied a purely mathematical test, holding that a foreclosure sale which brought only 57.7 percent of the market value of a debtor's property was subject to avoidance. In so holding, the *Durrett* court also observed that it had found no case in which a transfer for less than 70 percent of market value had been approved. *Id.* at 203. This dictum spawned the so-

called *"Durrett* rule," which, when mechanically applied, invalidates any transfer for less than 70 percent of fair market value. *See, e.g., In re Wheeler,* 34 B.R. 818, 821 (Bankr.N.D.Ala.1983).

\*\*\*

*Matter of Besing,* 1495 n. 14.

The Fifth Circuit, in *FDIC v. Blanton,* which dealt only with whether a sale of property was avoided under Texas state law as opposed to § 548 of the Bankruptcy Code, ruminates:

> The *Durrett* court suggested that a bankruptcy trustee or debtor-in-possession could avoid a nonjudicial foreclosure sale if the property sold for less than 70% of the fair market value ... Interestingly, bankruptcy courts frequently cite *Durrett* for the "70% test" based upon its dicta. *See, e.g., Willis v. Borg–Warner Acceptance Corp.,* 48 B.R. 295, 300–01 (S.D.Tex.1985). But on the facts actually before the *Durrett* court, it held only that 57.7% of market value does not constitute reasonably equivalent value.

(citations omitted). *FDIC v. Blanton,* at 532 n. 7.

However, notwithstanding the Fifth Circuit's hindsight evaluation of the extent of the theoretical straightjacket manufactured by *Durrett,* the very case cited by the *FDIC v. Blanton* court as an example of the stream of lower court mis-reliance, *Willis v. Borg–Warner Acceptance Corp.,* was perhaps a major culprit (along with the actual language of the *Durrett* opinion) in the perpetuation of the now deemed blind allegiance. Why? Well, because the *Willis* case was not just any lower court opinion.

The *Willis v. Borg–Warner Acceptance* court, the **District** Court for the Southern District of Texas, spoke through Circuit Judge Randall (now Circuit Judge King), sitting by designation (who was also the author or the *Besing* opinion). In addressing the question of whether a foreclosure sale of real property was subject to avoidance under § 548, the court stated:

> *Durrett* is further applicable to the issue of avoidability under Section 548 because the decision set the standard for determining whether the price obtained at foreclosure sale was less than a reasonably equivalent value in exchange for such transfer ... The 70% figure has been accepted in the Fifth and Eleventh Circuits as the benchmark test for setting aside transfers under section 548(a)(2). *See, e.g., In re Wheeler,* 34 B.R. at 821.

(collecting cases).[10]

To the underling bankruptcy courts in the circuit (or at least to this one), the *Willis* directive looked pretty clear and, as well, given the blanket reference to the "benchmark test for setting aside transfers under section 548(a)(2)" appeared indicative of a blanket benchmark applicable to sales of real estate, both via foreclosure and private sale.

So, as of *Fairchild Aircraft,* there was no blanket 70% benchmark test for determining reasonably equivalent value, though perhaps as a result of cases such as *Willis,* the lower courts had not known this. Of course, we all know the ultimate fate of *Durrett.* The end, after what might be seen to have been disavowed by its progenitor, was cruel and likely a complete obliteration.

---

10. Subsequently, the *Willis* court's observation concerning the Eleventh Circuit acceptance of the 70% benchmark test was disavowed. *See Walker v. Littleton (In re Littleton),* 888 F.2d 90 (11th Cir.1989); *Matter of Grissom,* 955 F.2d 1440 (11th Cir.1992).

In *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), the Supreme Court overruled *Durrett* by implication within the context of foreclosure sales. The issue before the Supreme Court was the narrow one of

... whether the consideration received form a noncollusive, real estate mortgage foreclosure sale conducted in conformance with applicable state law conclusively satisfies the Bankruptcy Code's requirement that transfers of property by insolvent debtors within one year prior to the filing of a bankruptcy petition be in exchange for "a reasonably equivalent value."

*id.* at 114 S.Ct. 1759 (citation omitted).

Finding fair market or market value to have "no applicability within the forced-sale context; indeed, it is the very *antithesis* of forced-sale value," *id.* at 1761, the Court concludes that consideration paid at a regularly conducted, noncollusive foreclosure sale complying with applicable state law conclusively provides reasonably equivalent value pursuant to 11 U.S.C. § 548(a)(2)(A). *id.* at 1765.[11]

Along the way, the court rather savages the Fifth Circuit's analytical process that resulted in the "*Durrett* Rule." [12] For example, "[f]raudulent transfer law and foreclosure law enjoyed over 400 years of peaceful coexistence in Anglo–American jurisprudence until the Fifth Circuit's unprecedented 1980 decision in *Durrett*." *id.* at 1764. Again, "[t]here is another artificially constructed criterion we might look

to instead of 'fair market price.' One might judge there to be such a thing as a 'reasonable' or 'fair' forced-sale price ... [P]erhaps that is what the courts that follow the *Durrett* rule have in mind when they select 70% of fair market value as the outer limit of 'reasonably equivalent value' for forecloseable property (we have no idea where else such an arbitrary percentage could have come from)." *id.* at 1762.

It will do to say that the Supreme Court concluded it improper to utilize fair market value, or any percentage of fair market value, as a benchmark for determining reasonably equivalent value in foreclosure sales of real property. A good argument can be made, however, that to the extent *Durrett* can be read for having applicability to nonforeclosure or private sales of real property, *BFP* does not disturb this facet of the "*Durrett* Rule." [13] This Court has found no post-*BFP* authority for such a proposition and would suggest that, though the *BFP* court presumed that the Fifth Circuit had been attempting to fashion a standard for determining a "fair forced-sale price," its description of the 70% figure as "an arbitrary percentage" should shoo away even a fervent *Durrett* supporter from arguing in favor of such a remainder.

So, if *Durrett* is dead (*vis a vis* establishing a 70% of fair market benchmark for reasonably equivalent value), with what are we formerly misguided bankruptcy courts left in terms of what exactly "reasonably equivalent value" means in nonfo-

---

11. In fact, as long as the sale complies with applicable state law, "the only legitimate evidence of the property's value at the time it is sold is the foreclosure price itself." *id.* at 1767.

12. The Supreme Court refers to "[t]his '*Durrett* rule' [which] has continued to be applied by some courts under § 548 of the new Bankruptcy Code." *See* 114 S.Ct. at 1760.

13. Remember, the thrust of *Durrett* is two-pronged. First, that a foreclosure sale is a transfer, like any other transfer, and second, that no cases had been found where a transfer for less than 70% of fair market value could survive avoidance. Recall, also, that the only case cited involved a nonforeclosure, private sale.

reclosure sale of real estate? The Supreme Court, in *BFP*, muses rather less than helpfully that: "Our discussion assumes that the phrase 'reasonably equivalent' means 'approximately equivalent,' or 'roughly equivalent.'" 114 S.Ct. at 1762 n. 4. With respect to the expressed dismissing of the dissent's argument that the majority's ruling rendered § 548(a)(2)(5) superfluous, the Supreme Court dictates "[t]his conclusion does not render § 548(a)(2) superfluous, since the 'reasonably equivalent value' criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure market." *id.* at 1765.

Drawing from the *BFP* dicta, then, we can say (at most) that the Supreme Court, in passing, seems to assume that outside the foreclosure context, a transfer of real property brings reasonably equivalent value if the debtor pays an amount roughly, or approximately, equivalent to the fair market value of the property.[14]

Prior to *BFP*, the Fifth Circuit, facing the question of whether dismissal by a state court of a debtor's tort and breach of contract claims as a sanction for discovery abuse was a transfer for less than reasonably equivalent value, referred with favor to those courts which, in the context of foreclosure values of real estate, had utilized a "totality of the circumstance" test to establish reasonable equivalence.[15]

■ At the hearing on the Motion for Summary Judgment filed by Boatmen's and Richardson, in which they sought to have both of the Trustee's causes of action dismissed, the Court dismissed the Trustee's action under 11 U.S.C. section 548,

after making a finding that Goldberg had *not* received "less than reasonably equivalent value" in his purchase of the Property. The range of possible values, owner financing of a second mortgage, and the armslength nature of the transaction combined to provide a totality of circumstances that established to the Court's satisfaction that the "less than reasonable standard" could not be met by the trustee. As mentioned, the Court then suggested that trial would be necessary to dispose of the § 544(b) action, because the range of possible values could not be sorted through by summary judgment process, and that a definitive valuation could be required due to the standard of recovery fixed by the Louisiana Revocatory Action. Counsel for the Stacy Trust, upon what we conclude was an inexplicable legal blunder, eschewed the Court's suggestion and stipulated to the lowest possible value of the property contained among the appraisals.

Needless to say, the Goldberg trustee graciously accepted and joined the stipulation. The parties also stipulated that Goldberg was insolvent at the time of the sale of the Property to him. The Court therefore agreed to decide the matter on the adverse motions for summary judgment based on the record and on these stipulated facts, without the necessity of trial. To assist the Court with its ruling, the Court requested that the parties brief the issue of whether "increases the obligor's insolvency," within the meaning of La.Civ.Code art.2036 (1984), means a "dollar-for-dollar" or a "reasonably equivalent value" standard of measure.

Unfortunately, because there were other components of this and other proceedings ·

---

**14.** "Approximate" has been defined as "to bring near or close ... to come near to or be close to in position, value or characteristic." Webster's Ninth New Collegiate Dictionary 98 (1990).

**15.** *See, Matter of Besing,* at 1495 n. 14.

that took center stage, including consolidation of adversary proceedings 95–1058 and 95–1061, the determination by the Court to consider the arguments became subsumed by these other proceedings. Though the Court reserved the ruling on the avoidability of the transfer under § 544(b), disposition was delayed by the final disposition of the various other actions which caused this matter to be deemed disposed of as well. Judgment was issued by the Court against the Mae M. Stacy Trust through the Trustee, Boatman's, in the amount of $63,000, together with pre— and post-judgment interest.

The Stacy Trust requested reconsideration of the judgment, and at hearing advanced much equitable discussion and as well a failure to recollect the aforementioned stipulation concerning value. The Court has obtained a transcript and has reviewed it (pleading 88).[16] The stipulation did occur and is of record. Why the Trust voluntarily stipulated to the lowest of a range of four (4) appraisals is beyond us. The stipulation, though, insured the Court's decision in favor of the trustee (where a valuation of $265,000 would have insured a decision in favor of the Trust). However, the Court concludes that reconsideration is to be granted in part. The judgment amount, $63,000, represented the difference between the price paid by Goldberg and the value of the property purchased. However, only $45,000 was paid in cash; the remainder of the price differential was represented by financing by the Trust. Therefore, it was improper to grant a $63,000 money judgment against the Trust. The judgment will be amended upon reconsideration to provide a money judgment of $45,000 plus pre— and post-judgment interest and the avoidance of $18,000 of the obligation owed under the owner financing.

For these reasons, the Court denies reconsideration in part and grants reconsideration in part.

## Conclusions of Law

### I. The Arguments of the Parties.

█ The defendants asserted various defenses the Court deems, at best, ill thought-out. These are the kitchen sink collection of *res judicata*, collateral estoppel, laches, waiver, mootness. This group of defenses is grounded in the stay relief motion whereby the first mortgage holder and the Stacy Trust were allowed to foreclose over the trustee's objection. The issues relevant to the stay relief motions were, of course, equity in the property and claim of security interest. The process by which stay relief is obtained is, of course, motion practice under Rule 9014 FRBP.

Stay relief does not extinguish avoidance actions. In fact, as was pointed by the Court on the question of whether the Louisiana Revocatory Action grants recovery for the purchase price paid over and above the value of the property. In fact, foreclosure limits the issue to exactly the question presented by the complaint: whether the cash paid was over and above the value of the property. This question cannot be implicated by enforcing rights arising from the failure to pay cash toward a debt.[17]

The only issue determined by the stay relief motion was equity in the property.

---

16. The motion was urged by Bank of America, N.A., the successor to Boatman's.

17. Though not relevant, the Court suggests that it is at least in bad taste to agree in open court that the trustee's rights are not implicated by the stay relief motion and then argue in pleadings that the rights are extinguished by the stay relief granted.

The avoidance action need not (and could not) have been raised as a defense to stay relief, because this particular avoidance action preserves viable security interests—the payment of the purchase price through notes and cash. These defenses are utterly without merit.

As noted, the Court is being asked to determine whether "increases the obligor's insolvency," within the meaning of Article 2036 of the Louisiana Civil Code, means a "dollar-for-dollar" increase, or whether an "increase of the obligor's insolvency" occurs only when "reasonably equivalent value" *has not* been given.

The Trustee argues that "increases the obligor's insolvency" entails a "dollar-for-dollar" analysis because to do otherwise would forbid the application of the Louisiana revocatory action in cases where the obligor received less than what was actually given but which was reasonably equivalent to its value, and because the "reasonably equivalent value" test of section 548 of the Bankruptcy Code [18] was created to deal with section 548 only, without the Louisiana revocatory action in mind. The Trustee also argues that the "plain meaning" of "increases the obligor's insolvency" requires a "dollar-for-dollar" test, rather than a "reasonably equivalent value" test.

The Stacy Trust counters that the Trustee's revocatory action must fail because: (1) the Court has found that in the Trustee's section 548 fraudulent transfer action, Goldberg received a "reasonably equivalent value"; and (2) the fact that Goldberg received a "reasonably equivalent value" means that his insolvency was not increased as a result of his purchase of the Property. The Stacy Trust responds to the Trustee's "dollar-for-dollar" argument using an *ab absurdum* tactic, namely, that a "dollar-for-dollar" analysis would hinder commercial transactions and the reasonable expectations of parties because "if the house was valued at $ 264,999.99, then the entire transaction would be avoidable as it would increase the Debtor's insolvency by a penny and value exchanged was not exact." [19] The Stacy Trust also supports its argument by pointing to the Uniform Fraudulent Conveyance Act ("UFCA"), which does not employ a "dollar-for-dollar" test but which, according to the Stacy Trust, instead employs a "reasonably equivalent value" test. Finally, the Stacy Trust argues that the revocatory action must be "strained in order to apply it to the instant facts" [20] because the revocatory action usually involves debtors who donate assets to the detriment of other creditors, and in the present case, the only asset released from Goldberg's patrimony

---

18. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). In this case, the Supreme Court, per Justice Scalia, held that, with regard to the "reasonably equivalent value" provision in section 548(a)(2) of the Code, the "reasonably equivalent value" for foreclosed real property is the price in fact received at the foreclosure sale, as long as all the requirements of the State's foreclosure law have been satisfied. The Court cautioned, however, that the "reasonably equivalent value" criterion of section 548(a)(2) will continue to have independent meaning outside of the foreclosure context, and that section 548(a)(2) will continue to be an exclusive means of invalidating foreclosure sales which, while not intentionally fraudu-

lent, nevertheless fail to comply with all governing state laws.

19. *See* the Stacy Trust Memorandum in Support of Motion for Summary Judgment, filed August 18, 1995, at 13. As we show, this straw man, though easily blown down, mischaracterizes the revocatory action—under the correct straw man analysis, the transfer of one penny would be avoided because that would be the extent to which the transfer caused or increased the insolvency of the transfer.

20. *Id.*

was a $ 45,000 down payment, which, given the two loans encumbering the property which Goldberg received, did not increase Goldberg's insolvency.[21]

## II. Louisiana Rules of Statutory Construction.

Justice Cardozo once described statutory construction as "so often ... a choice between uncertainties."[22] Whether this Court is confronted with a similar choice between "uncertainties" depends upon the amenability of Article 2036 to statutory interpretation, as set forth in the statutory construction articles of the Louisiana Civil Code.

Article 1 of the Louisiana Civil Code, reminding the Court of the primacy of legislation, provides that the "sources of law are legislation and custom,"[23] and Article 2 pronounces that "[l]egislation is a solemn expression of legislative will."[24] Therefore, the task before the Court is to determine the "legislative will" underlying the Louisiana revocatory action, as set forth in Article 2036 of the Louisiana Civil Code. With regard to accomplishing this task, Article 9 of the Louisiana Civil Code instructs the Court as follows:

### Art. 9. Clear and unambiguous law

When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature.

La.Civ.Code art. 9 (1988).[25]

Moreover, with regard to the meaning of words, Article 11 of the Louisiana Civil Code provides as follows:

### Art. 11. Meaning of words

The words of a law must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the law involves a technical matter.

La.Civ.Code art 11 (1988).

Acknowledging the possibility of linguistic frailty inherent in the legislative process, the Civil Code provides as follows for the situation where the Louisiana legislature is other than unambiguous in its solemn pronouncements:

### Art. 10. Language susceptible of different meanings

When the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law.

### Art. 12. Ambiguous words

When the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole.

La.Civ.Code arts. 10, 12 (1988).

Finally, abiding by its faith in the notion that the law is to be read as an organic

---

**21.** Like the Stacy Trust, and basically for the same reasons, Richardson also argues for a "reasonably equivalent value" test, rather than a "dollar for dollar" test. For the sake of convenience, when the Court addresses the Stacy Trust's arguments, the Court also concomitantly address Richardson's arguments.

**22.** *Burnet v. Guggenheim*, 288 U.S. 280, 288, 53 S.Ct. 369, 372, 77 L.Ed. 748 (1933).

**23.** La.Civ.Code art. 1 (1988).

**24.** La.Civ.Code art. 2 (1988).

**25.** This version of the Code provision emanates from an earlier and more pointedly colorful directive, found primarily in Article 13 of the Civil Code of 1870: "When a law is clear and free from all ambiguity, the letter of it is not to be disregarded, under the pretext of pursuing its spirit."

whole, the Civil Code provides in Article 13 as follows:

**Art. 13. Laws on the same subject matter**

Laws on the same subject matter must be interpreted in reference to each other.

La.Civ.Code art. 13 (1988).

The charge to this Court is clear and unambiguous: to determine whether, in light of its generally prevailing meaning, the phrase "increases the obligor's insolvency," as used in Article 2036 of the Louisiana Civil Code, is clear and unambiguous and, if so, to espouse its generally prevailing meaning. If not clear and unambiguous, resort is necessary to the other interpretative tools and methods afforded under Louisiana law to assist the Court in divining the intent underlying this expression of legislative will.

**III. The Plain Meaning of "Increases the Obligor's Insolvency."**

Following the directives of Louisiana statutory construction principles, and in particular Articles 9 and 11 of the Louisiana Civil Code, the Court first focuses on the plain language of Article 2036, which

sets forth the Louisiana revocatory action and provides as follows:

**Art. 2036. Act of the obligor that causes or increases his insolvency**

An obligee has a right to annul an act of the obligor, or the result of a failure to act of the obligor, made or effected after the right of the obligee arose, that causes or ***increases the obligor's insolvency.***

La.Civ.Code art.2036 (1984).

In determining the plain meaning of the phrase "increases the obligor's insolvency," the Court initially notes that this phrase makes *no reference whatsoever* to a "reasonably equivalent value" test [26] or even to the "fair consideration" test of the Section 3 of the UFCA.[27] Instead, Article 2036 of the Civil Code merely uses the word "increases," and the absence of "reasonably equivalent value" language or "fair consideration" language rings loudly in the Court's judicial ear. Accordingly, the Court will focus on the plain meaning of the term "increases." Taking note from one of the dictionaries of choice of the United States Supreme Court,[28] the Court finds that the definition of the word "increase" in Webster's Ninth New Collegiate Dictionary reads as follows:

(b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

UFCA, 7 U.L.A., section 3.

As noted, the Stacy Trust, but not Richardson, asserts that the UFCA utilizes a "reasonably equivalent value" test. Richardson correctly acknowledges that the UFCA utilizes a "fair consideration" test, rather than a "reasonably equivalent value" test, but essentially the tests are identical.

**26.** As noted, the "reasonably equivalent value" test appears in Section 548(a)(2)(A) of the Bankruptcy Code, and provides that the trustee may avoid certain transfers and obligations, if the debtor voluntarily or involuntarily "received less than reasonably equivalent value in exchange for such transfer or obligation."

**27.** Section 3 of the UFCA provides as follows:
Section 3. Fair Consideration. Fair consideration is given for property, or obligation,
(a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

**28.** *See Pioneer Inv. Services v. Brunswick Associates,* 507 U.S. 380, 113 S.Ct. 1489, 1494–95, 123 L.Ed.2d 74 (1993).

[T]o become **progressively** greater (as in size, amount, number, or intensity) .... to make greater: AUGMENT .... INCREASE, ENLARGE, AUGMENT, MULTIPLY mean to make or become greater. INCREASE used intransitively implies **progressive** growth in size, amount, intensity; used transitively it may imply simple not necessarily progressive addition ... the **act or process of increasing:** as ... addition or enlargement in size, extent, quantity.

Webster's Ninth New Collegiate Dictionary 611 (1990) (emphasis added).

As Webster's Dictionary states, the word "increase" means a *progressive* growth, that is, an *incremental* growth. Such progressive and incremental growth implies that when Article 2036 was drafted, the codifiers used the simple and easily-understood word "increase" because they meant to imply a "dollar-for-dollar" increase in the obligor's insolvency, rather than a "reasonably equivalent value" increase. Otherwise, the codifiers would not have chosen to use the word "increase" with no obvious limitation on its meaning. Moreover, since Article 2036 was crafted in 1984, well after the UFCA, which was enacted in 1918, the drafters of Article 2036 must have been well aware of the "fair consideration" requirement in Section 3 of the UFCA, and chose not to adopt such a limitation. Therefore, the Court may reasonably conclude that the plain meaning of "increases the obligor's insolvency" means a "dollar-for-dollar," incremental growth, rather than insolvency as measured by a "reasonably equivalent value" standard.

As of this stopping place, the Court has performed its task under the Louisiana Civil Code: to ferret out the plain meaning of Article 2036 of the Louisiana Civil Code from the words of the article, itself, if possible. However, the Court will resort to other modes of statutory construction *in support* of its "plain meaning" analysis, primarily to assure ourselves that the apparently groundless arguments of the defendants really are so.. Positing for argument purposes only (of course) that the phrase "increases the obligor's insolvency" is susceptible of more than one meaning (*i.e.*, a "reasonably equivalent value" meaning), analysis of the purpose of the Louisiana revocatory action and of its legislative history is now offered.

## IV. The Purpose and Legislative History of the Louisiana Revocatory Action.

### A. The *Actio Pauliana*.

The Louisiana revocatory action, codified in 1984 in Article 2036 of the Louisiana Civil Code, originated in the Roman Law as the *Actio Pauliana,*[29] and gives to creditors the right to bring *in their own name* an attack upon the acts taken by their debtor, by which the debtor has defrauded the creditors of their rights.

Scholar Max Radin has traced the *Actio Pauliana* to three Roman sources: the Institutes of Justinian; the Greek Paraphrase of the Institutes, attributed to Theophilus, the colleague of Tribonian; and the Digest. As will be seen, each of

---

**29.** *See* Benjamin M. Goodman, "The Revocatory Action," 9 Tul.L.Rev. 422, 422 (1935); Pearce–Reggio, "Recent Developments," 66 Tul.L.Rev. 1101, 1105 (1992). *See also* 4 C. Aubry & C. Rau, Cours de Droit Civil Francais section 313(C)(1), at 137 n. 1 (La.St. L.Inst.trans., 6th ed.1965); 2 Marcel Planiol, Traite Elementaire de Droit Civil, no. 297 (La.St.L.Inst.trans., 11th ed.1938); Buckland, Elementary Principles of Roman Private Law 393 (1912); Girard, Manuel elementaire de droit romain 422–28 (4th ed.1906); Colin et Capitant, Cours elementaire de droit civil francais II 244 (7th ed.1932); Radin, Fraudulent Conveyances at Roman Law, 18 Va. L.Rev. 109 (1931).

these three sources employs a "dollar-for-dollar" measure of recovery, rather than a "reasonably equivalent value" standard.

The first source, the *Institutes of Justinian*, 4,6,6, which actually sets forth Roman law on fraudulent conveyances, provided as follows:

Again if any one has transferred his property to another in fraud of his creditors, upon judgment to that effect by the chief provincial magistrate, the creditors of the transferor may seize his property, avoid the transfer and recover the things transferred; that is, they may claim that the things have not been transferred at all and accordingly are still within the legal possession of the debtor.[30]

Observe that in the above provision, the test for the revocatory action is *not* whether the debtor has transferred his property for "reasonably equivalent value," but is simply whether the debtor has or has not transferred his property in fraud of his creditors. Note as well that the measure of recovery is the seizure of the property, the avoidance of the transfer, and the recovery of the thing transferred—apparently, a "dollar-for-dollar" proposition.

The next Roman source to which the *Actio Pauliana* can be traced is the Greek Paraphrase of the *Institutes*, attributed to Theophilus, the colleague of Tribonian:

There is also another action *in rem* introduced by the praetor, to the following effect. A debtor has several creditors. He alienates some of his property and since he has the title, he transfers the title to the grantees. The creditors who have taken possession of the debtor's property under a judgment of a magistrate, may bring an action against the holder of the alienated property, since the alienation is in fraud of them. This action is called the 'Paulian action.' Its issue is framed as follows: 'If it appears that if the transfer by the debtor had not taken place, these goods would have remained the property of the debtor, etc.'.[31]

Like the first Roman source, this Roman source also contemplates the creditor's dollar-for-dollar recovery: if the transfer had not taken place, the goods would have remained the property of the debtor. Again, no mention is made of a "reasonably equivalent value" standard by which to measure this action.

Finally, the only other mention of the *Actio Pauliana* at Roman Law occurs in the *Digest* 22, 1, 38, 4, from Paul's commentary on Plautius, B6, and provides as follows:

Section 4. In the Fabian [*i.e.*, according to Mr. Radin, "fraud on the rights of a patron"] and Paulian action, which are used to recover what has been alienated in fraud of creditors, the profits must also be restored. For the praetor intervenes so that the situation might be as if nothing had been alienated at all. It is therefore in no sense inequitable that the profits should be included in the *act of restitution, since the praetor uses the words 'you are to restore' in their fullest sense.*[32]

This provision explicitly adopts a "dollar-for-dollar" method of recovery, in that the Paulian action is referred to as an act of *restitution,* to *restore* the creditor in the *fullest* sense, through the recovery of *what*

---

**30.** Max Radin, "Fraudulent Conveyances at Roman Law," 18 Va.L.Rev. 109, 109 (1931).

**31.** Max Radin, "Fraudulent Conveyances at Roman Law," 18 Va.L.Rev. at 109–110.

**32.** Max Radin, "Fraudulent Conveyances at Roman Law," 18 Va.L.Rev. at 109–110 (emphasis added).

*has been alienated* in fraud of creditors (*i.e.*, a "dollar-for-dollar" recovery of that which has been alienated). Like the other two sources of Roman law, no mention is made of a "reasonably equivalent value" standard of measure with regard to the *Actio Pauliana*.

In addition, it is noteworthy that in this excerpt from Roman law, it is the *praetor*, rather than the injured creditor, who brings the action. Moreover, because the action is described as being brought "in fraud of creditors," rather than for the benefit of one creditor only, this action appears to be similar to the holding of *Moore v. Bay*[33] and section 544(b) [34] of the Bankruptcy Code, both of which contemplate the trustee in bankruptcy bringing an action to benefit *all* creditors, rather than the creditor which could have brought the action. In contrast, as will be discussed below, the Louisiana revocatory action benefits the creditor which actually brings the action, rather than all creditors.

With regard to the *restitutionary* nature of the *Actio Pauliana*, which Paul's commentary on Plautius mentions, Mr. Radin has "indisputably" [35] found that the *Actio Pauliana*, as it appeared in the legislation of Justinian, was *restitutionary* in nature, and was not limited by a "reasonably equivalent value" standard. Mr. Radin writes:

> In Roman law itself, the action, whatever it was called, as it appears in the legislation of Justinian, is indisputably an amalgam of various forms of relief, which began perhaps with a ***restitutio in integrum*** and was later combined with an *interdict* and a personal action. This last was usually quasi-contractual in character, but might also have penal elements, and thus have sometimes sounded in tort, i.e., delict. All these things were fused into what in the Code and Digest is commonly called just 'the action', and characterized as '*utilis*', i.e. 'adapted' or 'on the case.' [36]

With regard to the longevity of the *Actio Pauliana*, it became very popular in modern Continental Europe after the revival of the systematic study of Roman Law in the twelfth century, and under that name was adopted into nearly all the legal systems of modern continental Europe, where the action became the mode for the procedure it describes.[37] For example, the *Actio Pauliana* was found in Spain, in the *Las Siete Partidas*,[38] and in the French Civil Code,[39] and presently exists in Spain and France.

---

**33.** 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931), *reversing In re Sassard & Kimball, Inc.*, 45 F.2d 449 (9th Cir.1930). The Court discusses *Moore v. Bay* and *Sassard infra.*

**34.** Section 544(b) of the Bankruptcy Code provides as follows:

> **Section 544. Trustee as lien creditor and as successor to certain creditors and purchasers**
> \*\*\*
> (b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. section 544(b) (1984). Section 544(b), and its relationship with *Moore v. Bay* and *Sassard*, is discussed *infra*.

**35.** Radin, "Fraudulent Conveyances at Roman Law," 18 Va.L.Rev. at 110.

**36.** Radin, "Fraudulent Conveyances at Roman Law," 18 Va.L.Rev. at 110 (emphasis added).

**37.** Radin, "Fraudulent Conveyances at Roman Law," 18 Va.L.Rev. at 110–111.

**38.** *See Las Siete Partidas*, 5.15.7–12. *See also* Goodman, *supra*, at 422.

**39.** *See* Article 1167 of the French Civil Code, and Article 66 196, 446, 447, 512, 520, and

Not only has the *Actio Pauliana* fostered in the Continental system, under the name "Paulian," but the action, under the name "fraudulent conveyance," has been accepted in the common law, where the expression *in fraudem creditorum*, that is, "in fraud of creditors," generated much difficulty, as it did at Roman law. In the following explanation by Mr. Radin of the difficulties generated by the word "fraud," Mr. Radin also emphasizes the *restitutionary* nature of the *Actio Pauliana* by virtue of its focus on *prejudice to the creditor*, rather than focussing on *actual intent to defraud:*

> **The point is that the term *fraus*, in Latin, does not really mean 'fraud' at all in the sense of 'deceit'—at any rate, not deliberate fraud.** The word for that is *dolus*. **The word *fraus* means 'prejudice' or 'disadvantage'....** Unfortunately, the word came to be applied both in legal as in non-legal writers to the quality of the act that caused the prejudice, as well as to the damage itself and so became almost—but not quite—interchangeable with *dolus*. An ambiguity was thus foisted upon the phrase *in fraudem creditorum*, which has compelled us to distinguish between 'actual' fraud and 'constructive' fraud, and forced other indirections upon us which have obscured the purpose and function of this form of relief.[40]

As will be discussed *infra*, these difficulties also plagued the Louisiana revocatory action, which, as has been noted, was patterned after the *Actio Pauliana*, and led to the radical revision of the Louisiana revocatory action by the Louisiana legislature in 1984.

**B. Planiol on the *Actio Pauliana*.**

Marcel Planiol, who with Pothier was one of the most prolific and influential French civilian scholars, wrote extensively on the *Actio Pauliana* in his monumental work *Traite Elementaire de Droit Civil* (La.St.L.Inst.trans., 11th ed.1938). Given Planiol's erudition on this subject, and the Louisiana Civil Code's historical roots in French and Spanish law, the Court has carefully examined Planiol's commentary. Although the Court usually refrains from lengthy quotes, the importance of Planiol's commentary necessitates that the Court quote extensively therefrom.

According to Planiol, the theoretical principle underlying *Actio Pauliana* was the furtherance of good faith[41] and an intolerance toward fraud:

> There is something worse for creditors than the negligence of the debtor: and that is his bad faith. A debtor burdened with debts, who is threatened with suit, is naturally tempted to conceal his assets from his creditors. For that purpose he has many means! The law, which always seeks to have good faith reign, cannot tolerate fraudulent operations. In every case where it is possible to discover them, it gives creditors a special action whereby they can avoid the consequences of the fraud. This action which is referred to as the 'Paulian,' or the 'revocatory action,' [In his footnote 7, Planiol added the following: "The word 'revocatory' comes to use from the Roman jurisconsults who employed especially the word '*revocare*' in

---

525, of the French Commercial Code (1808). *See also* Goodman, *supra*, at 422.

**40.** *Id.* at 110.

**41.** The UFCA incorporated a "good faith" element, while section 548 of the Bankruptcy Code and the Uniform Fraudulent Transfer Act ("UFTA"), which followed the UFCA, have dispensed with this element.

connection with the Paulian action '*per quam quae in fraudem creditorum alienata sunt revocantur*'. Digest Bk. XXII, Tit. 1, Fr. 38, section 4".] can be defined: as an action given to creditors to obtain the revocation of acts done by their debtor in fraud of their rights.[42]

Unlike Mr. Radin, who described the revocatory action at Roman law as contemplating "prejudice" or "disadvantage" to the creditor (*fraus*, rather than *dolus*), Planiol described the fraud contemplated by the French revocatory action as involving an intention to harm (*dolus*, rather than *fraus*):

> The fraud of Article 1167 [of the French Civil Code] is practiced in the absence of the victim and independently of what the latter thinks or says: it resides entirely in the intention of its author who seeks to extricate himself from the consequences of a prior act, in rendering impossible the pursuits of the creditor.... Strictly speaking, fraud consists in the intention to harm: the debtor desires to put his assets beyond the reach of his creditors.[43]

With regard to the *historical origin* of the *Actio Pauliana*, Planiol argued that the original form of the action was collective, brought by an administrator rather than a specific creditor, and benefitted the *entire* mass of creditors. In this sense, the original *Actio Pauliana* was more closely analogous to the holding of *Moore v. Bay* and section 544(b) of the Bankruptcy Code, than is the present revocatory action under Article 2036 of the Louisiana Civil Code, which sets forth an action to benefit the creditor who brings the action,

rather than all creditors. Planiol wrote as follows on this matter:

> The Paulian action given to creditors goes back to Roman Law. It is a creation of the Praetorian law, and it still bears the name of the praetor Paulus who introduced it, and who moreover is completely unknown. [In footnote 8, Planiol stated: "[S]uch a praetor never existed and the name '*Pauliana*' given to the action by a glossator never figured in the official text of the Digest."] It probably had existed at the time of Cicero. In Roman procedure that action had a characteristic feature, which it has lost: it was a collective action instituted in the name of the mass of creditors by a sort of administrator or syndic, the '*curator bonorum vendendorum*' and its outcome necessarily profited the mass. The action was brought after the general sale of the property of the debtor, when the sum thus obtained was insufficient to satisfy all the creditors. This collective form of the action has now disappeared, and the Paulian action has become an individual action, the exercise of which belongs separately to each creditor.[44]

Planiol's analysis of the *effects* of the French revocatory action yields a different result than that which was directed at Roman law and which is directed by *Moore v. Bay* and section 544(b) of the Bankruptcy Code: while the revocatory action can be distributed to the pursuing creditor only and to those who have joined him in the proceeding as also having suffered from the common fraud, *Moore v. Bay* and section 544(b) of the Bankruptcy Code direct that the benefits of an action brought by the trustee in bankruptcy inure

42. 2 Marcel Planiol, *Traite Elementaire de Droit Civil*, No. 296.

43. 2 Marcel Planiol, *Traite Elementaire de Droit Civil*, No. 312.

44. 2 Marcel Planiol, *Traite Elementaire de Droit Civil*, No. 297.

to *all* creditors. Planiol wrote as follows on the effects of the revocatory action:

> All of these effects are dominated by two essential considerations, drawn from the purpose of the action: (1) the creditor obtains the revocation of the fraudulent act; (2) the revocation is partial, and pronounced only in his interest.... The thing restored does not enter the patrimony of the debtor, nor does it become the common pledge of all his creditors; it can only be distributed to the pursuing creditor and those as having likewise suffered from the common fraud.... This solution is commonly justified by the 'authority of the thing adjudged'; but this is not the real reason.... [W]hen the creditors act under Article 1167 [of the French Civil Code] the creditors exercise a personal action which belongs to them, and the result, therefore, can profit only those who acted. The relative effect of the revocation is one of the greatest differences that separates the French practice and the old Roman law, according to which the thing restored came back into the patrimony of the debtor, for the benefit of all his creditors indiscriminatively [sic].[45]

As to the scope of the *Actio Pauliana*, Planiol found that the crux of the action was the *impoverishment* of the debtor, leading one to conclude that the action was *restitutionary* in nature, as will be discussed below. Planiol wrote as follows on the application of the revocatory action:

> The only acts which can give rise to a revocation upon the demand of creditors, given the proper case, are those by which the debtor has **impoverished himself;** if he has simply failed to enrich himself through negligence, the revocatory action is not available to them.

This fundamental rule is derived from the nature of the Paulian action, which is a revocatory action. Its object is to place the creditors in the same situation in which they found themselves before the fraudulent act; consequently it may be used to **reconstitute an impoverished patrimony, but not to augment it.**

> Every act which results **in the impoverishment of the debtor** may give rise to the revocatory action. Most often the action is directed against an alienation (sale, donation, etc.), by which the debtor has endeavored to cause the disappearance of his assets. As this is in fact a frequent kind of fraud ..., it is generally with reference to it that the reasons have been formulated; it must not be thought, however, that the revocatory action can be used only in the case of fraudulent alienations. On the contrary we should generalize: a juridical act of whatever kind, if it is fraudulent, can be attacked by such means, **if it impoverishes the debtor** .... [46]

Like Mr. Radin's analysis of Roman law, Planiol also found the *Actio Pauliana* to be purely *restitutionary* in nature, being generated by the impoverishment of the debtor, and the concomitant prejudice to the creditor. Central to Planiol's analysis is that the revocatory action is *delictual* in nature, having an objective of repairing, "dollar-for-dollar," the damage caused. Planiol wrote as follows:

> Under the common law, when an act is by its nature susceptible of revocation by the revocatory action, two conditions were sufficient to give rise to the action: (1) The act must have **caused a prejudice** to the creditors; (2) that prejudice

---

45. 2 Marcel Planiol, *Traite Elementaire de Droit Civil*, Nos. 329, 331.

46. 2 Marcel Planiol, *Traite Elementaire de Droit Civil*, No. 300, 301, 305 (emphasis added).

must have been known by the debtor. It is this last circumstance which constitutes the fraud . . .

*The damage is the determining cause of the action. It consists in the fact that the act of the debtor brings about his insolvency, or augments a pre-existing insolvency.* As a consequence, in order for the revocatory action to be possible it is necessary that the act be with reference to property subject to seizure by the creditors, and that it form part of their common pledge.

Such proof is a condition of the revocatory action. It is easy to furnish if the creditors have already 'discussed,' that is, seized and sold the property of the debtor; *if the price is not sufficient to satisfy all, the damage is not only demonstrated, but has also materialized.* However, the prior 'discussion' of the debtor is not always necessary; it may be that his insolvency is notorious, and that the damaging character of the act is already certain. The Romans, who knew the Paulian action only as a means of avoiding the sale of the property, *presumed the existence of the damage, eventus damni: 'Ita demum revocatur, si eventum fraud habuit'* (Digest Bk. XLII, Tit. 8, Fr. 10, section 1).

The Paulian action is an action which belongs to creditors in their own right. What has just been said must be considered on the basis of general principles in order to be well understood. We know, generally, that creditors are treated, in relation to the debtor, as successors and not as third parties: the acts which the debtor does to his patrimony, which is their pledge, are admissible against them. *Thus when property is sold, it comes out of the patrimony of the debtor; it at the same time depletes the pledge of the creditors and is lost to them (at least if they have no mort-*

*gage giving them a right to follow it up). The creditors are obliged to suffer the effects of all his acts. This is the result of their quality as assignees not having rights distinct from those of the debtor . . . .* This result is usually expressed by saying that the debtor represents his creditors. But this is true only under one condition: the debtor must act in good faith. If he commits a fraud, if he tries to make his assets disappear in order to avoid paying his debts, his conduct gives birth to a new action in favor of his creditors, distinct from the first, for *the fraud is a civil tort and as such produces an obligation to repair the damage caused. The creditor thus armed with a special action ceases to suffer the effect of the fraudulent act.* Also it is said that the debtor who acts fraudulently ceases to represent his creditors . . . which simply points to the possibility that creditors may avoid the effects of a particular act. . . .

*The object of the revocatory action is to make reparation to the creditors for the damage they have suffered by the fraud committed against them by the debtor. This is the principal object of the action;* let us see by what judicial process we arrive at it. *In the beginning the Paulian action was penal in origin, 'ex delictio,' which led to a pecuniary penalty equal to the prejudice caused, but a restitution in nature was frequently obtained, due to the arbitrary character of the action.* The creditors were therefore permitted to regain effective possession of the property fraudulently alienated. In that way the language of the texts was justified: *'revocando ea quae *** alienata sunt'* (Dig. Bk. XLII, Tit. 7, Fr. 1, section 1). *The form of the Roman procedure is lost, but the result remains:*

*the revocatory action, even in our day, tends to procure restitution in nature, and it is this which has given it the name of 'revocatory action;'* the creditor who exercises it is not assimilated to the other creditors of the third party being pursued by him.... The revocatory action has thus entered into the family of actions in nullity.

Such was already the language of Pothier who speaks ... of 'rescinding' an alienation or of 'declaring the nullity' of the acceptance of a succession, etc.... But the nullity which results from the Paulian action is not a nullity like the others; the fraudulent act is only annulled in the interest of the defrauded creditor and remains effective with all its consequences with regard to all other persons; thus it is more proper, in referring to it, to use the expression 'revocatory action,' which indicates its special nature. [In footnote 15, Planiol writes as follows: "The limited effects of the Paulian action separate it so sharply from the other actions in nullity that name is sometimes refused it. It has been contended that it was *a simple personal action 'in reparation of a prejudice caused,'* and not an action in nullity.... In considering the Paulian action as *a simple action in indemnity,* it is impossible to explain one of its most interesting effects: the preference which it gives to the plaintiff creditor over the other creditors of the third party ...".].

In this acquiring an effect which approaches that of actions in nullity the revocatory action has preserved the fundamental character which it has always had in accordance with the principle of its institution; *it has not ceased to be an action for an indemnity arising from an illicit act; it always tends to repair the damage suffered by the creditor and belongs to the group of delictual actions.* The nullity which is its consequence is the most direct and simple means of assuring to the creditor the reparation to which he has a right.

*The revocation is pronounced only to the extent of the damages suffered by the pursuing creditor. As a consequence if the damage is less than the value of the thing reclaimed, the third party has a right to keep it on satisfying the claim of the creditor. The latter cannot refuse the payment offered by the third party, and once paid he can claim nothing more from him.*[47]

Finally, Planiol described the revocatory action as it existed in commercial law, and in particular with regard to bankruptcy. *Of particular interest and importance* is that the *Actio Pauliana,* when applied to French commercial operations and bankrupts, no longer retained its characterization as a personal right which inured to the benefit only of the prejudiced creditor who brought the action, rather than to the benefit of *all* creditors. To the contrary, in French commercial operations, the *Actio Pauliana* retained its true Roman character: that is, the assets recovered reentered the patrimony of the debtor, again became the common pledge of all his creditors, and could be distributed *pro-rata* to such creditors, whether or not each creditor joined the pursuing creditor in the proceedings and whether or not each creditor likewise suffered from the common fraud. As such, the *Actio Pauliana,* when applied in the context of French commercial transaction, falls squarely within the ambit of *Moore v. Bay* and section 544(b) of the Bankruptcy Code, both of which

---

**47.** 2 Marcel Planiol, *Traite Elementaire de Droit Civil,* Nos. 309, 310, 311, 319, 327, and 331 (emphasis added).

require that recovered assets re-enter the bankrupt's estate and be distributed to *all* creditors. Planiol wrote as follows on this matter:

> The creditor who has been paid has nothing to restore for he has received only what was due him.... [H]e therefore has a sufficient title to keep the money.—However a giving in payment can be annulled if it is the result of concerted fraud ... Such is the original rule, preserved in the civil law, but the commercial law follows a different rule. There has been devised what is referred to as the *'report d'ouverture de lafaillite,'* in bankruptcy proceedings, which permits payments made prior to the declaration in bankruptcy to be reached, and forces the creditors to restore to the mass what they have received.... Those are special articles governing bankrupts, and are applicable only to persons engaged in commerce....
>
> Articles 446 and 447 of the [French] Code of Commerce provide for different cases of nullity which are nothing other than *applications of the principle of the Paulian action to commercial operations; but there the action takes on a character of particular severity.* The most suspicious acts are annulled by operation of law; the others may be annulled by the judge, if the third party who dealt with the bankrupt had knowledge of the cessation of payments; and it should be observed that the nullites effect [sic] even payments which under the civil law are beyond the scope of the

revocatory action [e.g., full payment of one creditor over another and the incurring of new debts]. *It should be added that the commercial law has preserved the collective form which the Paulian action had in Roman law, and that the action exercised by the syndic in the name of all the creditors serves to get property back into the 'mass' for the benefit of all.*[48]

### C. The Elements of the Revocatory Action.

Traditionally, the civil law has had four requirements which the creditor must prove in order to prevail in a revocatory action: anterior debt, insolvency, prejudice, and fraud.[49] The first element, anterior debt, requires the creditor to show that it extended credit to the debtor prior to the debtor's prejudicial act; the second requirement is that the debtor must have become insolvent or increased a pre-existing condition of insolvency as a result of his or her act; the third element requires proving that the debtor's act prejudiced the creditor's rights; and the fourth element is proof of fraud.[50]

The revocatory action usually is directed against a sale or a donation, but any action may be attacked which fraudulently diminishes the debtor's assets.[51] Under Roman law, the creditor could attack only those acts by which the debtor diminished his patrimony, so if the debtor merely failed to acquire, the revocatory action was not available.[52]

48. 2 Marcel Planiol, *Traite Elementaire de Droit Civil*, Nos. 307 and 335 (emphasis added).

49. *See* Pearce–Reggio, *supra*, at 1105; 2 Planiol, *supra*, at Nos. 309–12.

50. *See* Pearce–Reggio, *supra*, at 1105–07.

51. *See Fennessy v. Gonsoulin*, 11 La. 419, 424, 1837 WL 823 (1837); *Block v. Marks*, 16 So. 649, 650 (1895); Planiol et Ripert, Traite pratique de droit civil francais VII 245 (1931). *See also* Goodman, *supra*, at 427.

52. *See* Goodman, *supra*, at 427; Girard, *supra*, at 423. Under current Louisiana law, however, when a debtor renounces a succes-

In 1984, the Louisiana legislature radically changed the revocatory action by eliminating fraud as a requirement and replacing fraud with the requirement that the debtor's act caused or increased the debtor's insolvency.[53] As Comment (a) to Article 2036 of the 1984 Louisiana Civil Code notes, Article 2036 is new only in that it "abandons the notion of fraud contained in the source articles. Otherwise, it reproduces the substance of C.C. Arts. 1969, 1970, 1971, 1972, 1975, 1977, 1985, 1986, 1988, and 1994 (1870)." Article 2036 thus replaced the subjective notion of fraud with an objective one.[54] The official

reasons underlying this revision can be found (as stated by Mr. Radin, *supra*) in the problems inherent in confusing *fraus*, meaning "prejudice," with *dolus*, meaning "fraud." These reasons were set forth as follows in the *Expose des Motifs:*

> The law pertaining to the protection of creditors from the unjust deprivation of their rights through contracts made by their debtors was in dire need of reform. The articles of the 1870 Code on this subject were unduly complex and lacked necessary threads of consistency. Many of the provisions were not useful in a modern setting, and federal bank-

---

sion, his or her creditor may accept the succession for the debtor. *See* La.Civ.Code art. 1021 (1870). Two actions exist by which a creditor could annul an heir's renunciation under Article 1021: the revocatory action and the oblique action, although the preferred interpretation of Article 1021 requires the creditor to use the oblique action. *See Succession of Neuhauser,* 579 So.2d 437 (La.1991). In modern civil law, the heir is said to diminish his or her patrimony by refusing a succession, whereas in Roman law, this was not the case. *See* Goodman, *supra,* at 427.

**53.** *See Farm Credit Bank of Texas v. Vallee,* 148 B.R. 1021, 1022 (W.D.La.1992), which notes that the debtor's largess "may seem rather immaterial, but for the fact that [the debtor] was insolvent when he made the renunciation and that the renunciation made him *further insolvent."* (emphasis added). Although, as mentioned, the Court and the parties have found no cases dealing with the issue of whether prejudice to the creditor is measured by a "dollar-for-dollar" standard or a "reasonably equivalent value" test, the Court notes that *Vallee's* mention of "further insolvent" suggests a "dollar-for-dollar" standard. *See also Central Bank v. Simmons,* 595 So.2d 363, 366 (La.App.2d Cir.1992), where, in an action brought under Article 2036, the court utilizes a balance sheet to calculate the amount of the debtor's insolvency, *after* the deeds, donations, and mortgages at issue were executed. The *Simmons* court's use of a balance sheet to make this calculation strongly suggests to this Court that a "dollar-for-dollar" analysis of Article 2036, rather than a "reasonably equivalent value" test, is appro-

priate, although the *Simmons* case did not specifically so hold.

**54.** *See* La.Civ.Code art.2036, cmt. (b) (1984). *See also Thomassie v. Savoie,* 581 So.2d 1031 (La.App.1st Cir.1991), *writ denied,* 589 So.2d 493 (La.1991). Another major revision was that the substance of former Articles 1968, 1983, and 1984, which dealt with the giving by the obligor of an advantage or preference to a creditor over other creditors of the obligor, were not reproduced in the 1984 Obligations Revision. *See* La.Civ.Code art.2036, cmt. (g) (1984). The new law eliminates the availability of the Louisiana revocatory action for the mere giving of a preference to a creditor by means of a security device for the payment of a just debt, when the value of the security is commensurate with the amount of the debt. Accordingly, acts granting a *security interest* only are revocable in bankruptcy, while acts causing or increasing insolvency are revocable under Article 2036. *See Warren v. Bergeron,* 636 So.2d 1013 (La.App. 1st Cir. 1994), *reh'g denied, writ denied,* 642 So.2d 1295 (La.1994). For a case brought under the 1870 revocatory action, which required proof of the debtor's intent to defraud the creditor, *see Matter of Lenard,* 849 F.2d 974 (5th Cir.1988) (creditor could maintain Louisiana revocatory action to set aside a real property transfer actually made by the debtors, although ostensibly made by the debtors' daughter, where the transfer was made at far below market value and rendered the debtors insolvent).

ruptcy law had made many of the provisions obsolete. The provisions of the 1870 Code on the giving of unfair preference to one of several creditors, for example, fell within the scope of federal law.

The basic principle established in the revision is that an obligee has the right to annul the results of the obligor's acts or omissions, made or effected after the right of the obligee arose, that cause or increase the obligor's insolvency.

This principle substitutes the concept of an act of the obligor that causes or increases his insolvency, or gives undue preference to another obligee, for the notion of an act in 'fraud' of creditors. As used in the source articles, the word 'fraud' was a technical term that did not necessarily connote bad faith. Furthermore, it had a highly subjective meaning. Through the above-mentioned substitution, the test for availability of the revocatory action has been made an objective one; that is, whether or not prejudice to the obligee's right has been caused by the obligor's act. This criterion permits the revocation of an obligor's act even if it is not done intentionally but through negligence.

The new criterion should also prevent the kind of confusion that attorneys and the courts previously experienced in trying to construe the word 'fraud' in this context. Sometimes actual bad faith was alleged, though not proven. At times, the courts held that fraud meant only 'constructive fraud;' that is, an attempt by the obligee to obtain a preference vis-a-vis other obligees. The supreme court, through Justice Hamiter, dealt exhaustively with the meaning of these terms in *Gast v. Gast*, 206 La. 285, 19 So.2d 138 (1944). To avoid the pitfalls inherent in application of a concept as slippery as fraud, the revised articles make prejudice to the obligee's rights the crucial factor. For similar reasons, the criterion of damage to the obligee's rights has been substituted for that of fraud in the Quebec Draft Civil Code (1977).

Besides the oblique action and the action in declaration of simulation, the revocatory or Paulian action, which derives from Roman law, is the most important weapon in the obligee's arsenal; it is the civil-law analogue to the common-law suit to set aside a fraudulent conveyance.

According to the revised articles, ... [o]nerous and gratuitous contracts that increase or cause the insolvency of an obligor may be attacked under Articles 2038 and 2039. ... An act or the result of failure to act, may be annuled through the revocatory action only to the extent that the act or result affects the rights of the obligee. Article 2043.[55]

Because Comment (a) to Article 2036 of the current Civil Code specifically referenced Articles 1969, 1970, 1971, 1972, 1975, 1977, 1985, 1986, 1988, and 1994 of the Civil Code of 1870, this Court feels constrained to reproduce those provisions in the chart below, with a view toward aiding the Court in its present statutory construction endeavor.

**THE LOUISIANA REVOCATORY ACTION AS EVIDENCED IN THE CIVIL CODES**
**OF 1870, 1825, 1808, and 1804**

---

**55.** 1984 La.Acts No. 331 (1984), Revision of Obligations, *Expose des Motifs*, at 80–81, *reprinted in* Saul Litvinoff, The Law of Obligations in the Louisiana Jurisprudence 499–500 (1985).

| CIVIL CODE OF 1870 | CIVIL CODE OF 1825 | CIVIL CODE OF 1808 | CIVIL CODE OF 1804 |
|---|---|---|---|
| **Article 1969:** "From the principle established by the last preceding article [Article 1968, that "the property of the debtor shall be liable for all consequences attending the[ ] non-performance [of all obligations]], it results that every act done by a debtor with the intent of depriving his creditor of the eventual right he had upon the property of such debtor, is illegal, and ought, as respects such creditor, to be avoided." | **Article 1964:** same as Article 1969 of the 1870 Civil Code, but a comma after "principle". | **Article 66:** "Nevertheless a creditor may exercise all the rights and actions of his debtor, except such as are exclusively attached to the person," and **Article 67:** "He can also in his own name, attack the acts done by his debtor, tending to defraud him of his rights." | **Articles 1166 and 1167** were identical to Articles 66 and 67 of the Civil Code of 1808, respectively. |
| **Article 1970:** "The law gives to every creditor, when there is no cession of goods, as well as to the representatives of all the creditors where there is any such cession, or other proceedings by which they are collectively represented, an action to annul any contract made in fraud of their rights." | **Article 1965** was identical to Article 1970 of the Civil Code of 1870, but had no punctuation after "goods." | No corresponding article. | No corresponding article. |
| **Article 1971:** "This action can only be exercised when the debtor has not property sufficient to pay the debt of the complaining creditor, or of all his creditors where there has been a cession, or any proceeding analogous thereto." | **Article 1966:** Same as Article 1971 of the Civil Code of 1870, but with a comma after "exercised." | No corresponding article. | No corresponding article. |
| **Article 1972:** "It can not be exercised by individual creditors, until their debts are liquidated by a judgment, unless the defendant in such action be made party to the suit for liquidating the debt "brought against the original debtor in the manner hereinafter directed." | **Article 1967:** Same as Article 1972 of the Civil Code of 1870. | No corresponding article. | No corresponding article. |
| **Article 1975:** "The plaintiff in the action given in this section may join the suit for annulling the contract to that which he brings against the original debtor for liquidating his debt by a judgment, and in such suit either of the defendants may controvert the demand of the plaintiff." | **Article 1970:** Same as Article 1975 of the Civil Code of 1870. | No corresponding article. | No corresponding article. |
| **Article 1977:** "The judgment in this action, if maintained, shall be that the contract be avoided as to its effects on the complaining creditors, and | **Article 1972:** "The judgment in this action, if maintained, shall be that the contract be avoided as to its effects on the complaining creditors, and | No corresponding article. | No corresponding article. |

| | | | |
|---|---|---|---|
| that all the property or money taken from the original debtor's estate, by virtue thereof, or the value of such property to the amount of the debt, be applied to the payment of the plaintiff." | that all the property or money taken from the original debtor's estate, by virtue thereof, or the value of such property to the amount of the debt, be applied to the payment of the plaintiffs." | | |
| **Article 1985:** "By being in insolvent circumstances is meant, that the whole property and credits are not equal in amount, at a fair appraisement, to the debts due by the party. And if he, who alleges the insolvency shows the amount of debts, it is incumbent on the other party to show property to an equal or greater amount. To prove the state of his affairs at the period of the contract, the debtor may, at the option of the plaintiff, be examined as a witness in the action for annulling the contract." | **Article 1980:** Same as Article 1985 of the Civil Code of 1870. | No corresponding article. | No corresponding article. |
| **Article 1986:** "No sale of property, or other contract made in the usual course of the party's business, nor any payment of a just debt in money, shall be affected by virtue of any provision in this section, although the party was in insolvent circumstances, and the person with whom he contracted, or to whom he made the payment, knew of such insolvency." | **Article 1981:** Same as Article 1986 of the Civil Code of 1870. | No corresponding article. | No corresponding article. |
| **Article 1988:** "If a debtor, in insolvent circumstances, shall anticipate the payment of a debt not yet payable, and shall make this payment to the injury of the creditors whose debts were either then due, or would fall due before that of which he anticipated the payment, this shall be deemed to have been done in fraud of the creditors, and the creditor so preferred shall be obliged to share the loss ratably with the complaining creditors, each creditor, however, preserving the right of mortgage or privilege, if any, which his original debt gave him by law." | **Article 1983:** "If a debtor, in insolvent circumstances, shall anticipate the payment of a debt not yet payable, and shall [make this payment], to the injury of the creditors whose debts were either then due, or would fall due before that of which he anticipated the payment, this shall be deemed to have been done in fraud of the creditors, and the creditor so preferred shall be obliged to share the loss rateably with the complaining creditors, each creditor, however, preserving the right of mortgage or privilege, if any, which his original debt gave him by law." | No corresponding article. | No corresponding article. |
| **Article 1994:** "The action given by this section, is limited to one year; if brought by a creditor individually, to be counted | **Article 1989:** Same as Article 1994 of the Civil Code of 1870, but with a comma after "action" and a colon after "year". | No corresponding article. | No corresponding article. |

from the time he has obtained judgment against the debtor; if brought by syndics or other representatives of the creditors collectively, to be counted from the day of their appointment."

The Court observes from the above chart that, as noted previously, the only meaningful change which the revocatory action has undergone in Louisiana is the elimination of fraud as one of the requirements to bring the action. The replacement of fraud with the requirement that the act to be revoked must have caused or "increase[d] the debtor's insolvency" leads the Court to examine this new concept in more detail. In particular, the Court now will focus on the traditional civilian requirement of a showing of *prejudice to the creditor*, because the notion of *increasing* the obligor's insolvency goes directly to the necessity of showing prejudice to the creditor. The Court therefore now turns to the third requirement of the revocatory action, namely, proving that the debtor's act prejudiced the creditor's rights.[56]

Article 3182 of the Louisiana Civil Code provides that if the debtor has bound himself or herself personally, the debtor "is obliged to fulfill his engagements out of all his property, moveable and immovable, present and future." According to Article 3183 of the Civil Code, this property is the "common pledge" of the debtor's creditors. Accordingly, the creditors will suffer prejudice if the debtor has stopped the creditors' avenue of recovery from the debtor's property.[57] As may be seen in the above chart, the Civil Code of 1870 required the creditor to prove prejudice, and the 1984 revisions to the Code, by including the phrase "increases the obligor's insolvency," did not dispense with this requirement.

The notion of prejudice to the creditor fits neatly into the issue currently before the Court: must the creditor prove a "dollar-for-dollar" prejudice, or will the creditor be unable to prove prejudice if all he or she can prove is that the debtor received "reasonably equivalent value" for the sale or donation? The Court again looks to the 1870 Civil Code to find the answer to this inquiry, and in so doing, the Court notes that it may confidently rely upon the revocatory action articles of the Civil Code of 1870, because the 1984 revision to the 1870 articles specifically renounced the fraud requirement only, and specifically retained all other concepts inherent in these articles. Article 1972 of the Louisiana Civil Code of 1825 and Article 1977 of the Civil Code of 1870, both reproduced in the above chart, focused on *the value of such*

56. *See Premier Bank, N.A. v. Stout*, 627 So.2d 188, 191 (La.App. 3 Cir.1993); Tate, "The Revocatory Action in Louisiana Law," Essays on the Civil Law of Obligations 133 (Daniow ed.1969). The Court notes that the *Premier Bank* court found that if Premier Bank had contracted with the obligors *after* they had recorded the instrument for a Trust, into which they had transferred $1,500, then Premier Bank had no cause of action to revoke the $1,500 transfer made by the obligors to the Trust. The court therefore remanded the case for further proceedings to determine when Premier had contracted with the obligors. The implication of this holding is that if Premier could prove that it had contracted with the obligors before the transfer, then Premier could revoke the entire $1,500 transfer, suggesting a "dollar-for-dollar" recovery, with no inquiry into whether the transfer resulted in "reasonably equivalent value."

57. *See* Pearce–Reggio, *supra*, at 1106; 4 Aubry & Rau, section 313(C)(1); 2 Planiol, no. 310.

*property to the amount of the debt* and provided as follows:

> The judgment in this action, if maintained, shall be that the contract be avoided as to its effects on the complaining creditors, and that all the property *or money* taken from the original debtor's estate, by virtue thereof, *or the value of such property to the amount of the debt,* be applied to the payment of the plaintiffs.[58]

This provision explicitly states that all the property *or money* taken from the obligor's estate, *or the value of such property to the amount of the debt,* is to be applied to the payment of the creditor. In the Court's view, this provision clearly employs a "dollar-for-dollar" measure of reimbursement, rather than a "reasonably equivalent value" standard, because the provision speaks of "money" and, alternatively, of "value." Both money and value are measured incrementally, in dollars; neither money nor value is measured by "reasonable equivalents" or "fair consideration." Extrapolating from this concept of measuring "money" and "value," which concept explicitly was retained in Article 2036 of the 1984 Civil Code, the Court confidently concludes that the phrase "increases the obligor's insolvency" necessitates a "dollar-for-dollar" standard of measure, rather than a "reasonably equivalent value" test.

The Court finds its analysis to be supported by Benjamin M. Goodman, who, most thoughtfully, has reflected on the concept of prejudice to the creditor as follows:

> Third parties thus can stop the revocatory action by indemnifying the creditor.

When the third party refunds the amount of the debt, the required prejudice to the creditor no longer exists. [The following is footnote 49, which followed the word "debt," in the preceding sentence, in the original text:] How much must the third party, who seeks to refund the creditor, offer? Suppose the debtor owes $100,000, there are no privileges, and he had one piece of property worth $10,000. The property is sold in fraud of the creditors and one of them, to whom is owed $5,000, institutes the revocatory action. If the property had been seized and sold for $10,000, each creditor would have received ten percent of the amount of his claim. The creditor instituting the revocatory action would have received but $500. It seems, therefore, that since other creditors could have come in for their share, the fraudulent alienation causes the creditor only $500 damages. It would be unjust, however, to allow the third party to stop the revocatory action by offering to refund that amount. If there had been no fraudulent alienation and the creditor sued the debtor directly the latter would not be able to contend that if all the other creditors had sued he would receive but $500, and, therefore, he must be content with that amount. The third party against whom the action is instituted, and who is the transferee of the debtor, has no greater rights than his transferor. Consequently, the third party must return the entire value of the property, if it is required to satisfy the debt.

Benjamin M. Goodman, "The Revocatory Action," 9 Tul.L.Rev. 422, 429 (1935).[59]

---

58. La.Civil Code art.1972 (1825) and art.1977 (1870) (emphasis added).

59. Mr. Goodman cites the following in support of his proposition: Huc, *Commentaire theorique et pratique de Code Civil VII,* n 225,

p. 301 (1894). *See also* Paul David, Note, "The *Dation en Paiement:* Problems with the Elusive Concept of Prejudice when Bringing the Revocatory Action," 40 La.L.Rev. 221, 225 (1979). In his discussion of the elusive

■ Central to the notion of prejudice to the creditor is the requirement that the revocatory action never be a source of profit to the creditor by placing him or her in a better situation than if the fraudulent act had never taken place.[60] Accordingly, the money or other consideration given by the acquirer to the debtor must be taken account of so as to limit the profit to the creditor, for the creditor cannot receive the benefit of total revocation, and also the benefit of the price paid to the debtor (this is the more formal answer to the previously blown down straw man constructed by defendants).[61] The fact, however, that the creditor cannot profit from the revocatory action, does not detract in the least from the entire purpose underlying the action: that the creditor must be fully compensated for his or her loss, that is, for the amount by which the act to be revoked "increase[d] the obligor's insolvency." Under this interpretation, a "dollar-for-dollar" measure of damages, rather than a "reasonably equivalent value" test, is imperative, in order that the creditor not profit from the revocatory action. Clearly, restricting a creditor's profit is much easier and much more accurate if a "dollar-for-dollar" test is utilized to determine the amount by which the obligor's insolvency increased; attempting to limit the creditor's profit with a "reasonably equivalent value" test would be uncertain at best, and grossly inaccurate at worst.

In discussing the concept of prejudice with regard to the Louisiana revocatory action, the Court notes briefly that the Stacy Trust's and Richardson's earlier attempts at an argument *ab absurdum* fail considerably when viewed in the light of prejudice to creditors. As was noted above, the Stacy Trust and Richardson both argue that a "dollar-for-dollar" test, rather than a "reasonably equivalent value" test, would lead to the absurd result that a creditor could bring a revocatory action when he or she has been damaged by one cent; that is, when the obligor's insolvency has been increased by one cent. Although the Stacy Trust and Richardson offer this argument to support their argument *ab absurdum*, in fact, their argument itself is absurd. Clearly, if the obligor's insolvency has been increased by one cent, then the creditor has suffered prejudice in the amount of one cent. What creditor, however, would bring a revocatory action under such circumstances? No doubt, the

---

notion of prejudice to creditors, Mr. David refers to situations where, even when a debtor is insolvent, the creditor might nonetheless fail to prove prejudice, if creditors with a superior rank to the creditor instituting the revocatory action could have claimed all of the incoming assets, had the debtor accepted them. In this situation, the creditor bringing the revocatory action would not have received anything, even had the debtor accepted.

60. For this reason, the jurisdiction in a revocatory action is based on the plaintiff-creditor's claim, and not on the value of the property, because the judgment in a revocatory action subjects the property to the amount of the plaintiff's claim only, rather than returning the entire property. *See Zuberbier & Behan v. Morse*, 36 La.Ann. 970, 1884 WL 8103 (1884).

61. Goodman, *supra*, at 429. *See also* Planiol et Ripert, *supra*, at no. 962, p. 265, and Article 1982 of the Civil Code of 1870, which provided:

If the party with whom the debtor contracted be in fraud as well as the debtor, he shall not, on the annulling of the contract be entitled to a *restitution* of the price or the consideration he may have paid, except for so much as he shall prove has inured to the benefit of the creditors by adding to the amount of property applicable to the payment of their debts. . . .

La.Civ.Code art.1982 (1870) (emphasis added). *See also Chaffe v. Gill*, 43 La.Ann. 1054, 10 So. 361 (1891); *Metropolitan Bank v. Aarons–Mendelsohn Co.*, 50 La.Ann. 1047, 1053, 24 So. 125, 127 (1897).

creditor could institute such an action if he or she so desired, but given that the creditor would have to pay filing fees, which far would outweigh the one cent in damages, the probability of a creditor pursuing such an action makes little or no sense. Indeed, in this case, with the offset of filing fees against the one cent in damages, it can hardly be said that the creditor has suffered prejudice. In any case, whether or not a creditor could bring a revocatory action when the creditor has suffered prejudice in the amount of one cent is irrelevant to the issue of whether the "dollar-for-dollar" test or the "reasonably equivalent value" test should be employed by the court when interpreting Article 2036.

The Court finally disposes of the Stacy Trust's and Richardson's argument that the Louisiana revocatory action must be "strained in order to apply it to the instant facts." [62] The Stacy Trust and Richardson argue that because the revocatory action usually involves debtors who donate assets to the detriment of other creditors, and in the present case, the only asset released from Goldberg's patrimony was a $45,000 down payment, which, according to the Stacy Trust and Richardson, did not increase Goldberg's insolvency, because two loans encumbered the property which Goldberg received. This argument is without merit, because it relies upon a "reasonably equivalent value" analysis of the facts before the Court; that is, that the only asset removed from Goldberg's patrimony was $45,000, whereas he received in exchange a house encumbered by two notes, one of which was owner financed. Regardless of whether the house was encumbered by two notes, the fact remains that Goldberg's patrimony was reduced by $45,000, plus the amount of the

indebtedness over and above the value of the property plus the $45,000, and consequently, Goldberg's creditors were prejudiced in the amount of $63,000. In making this conclusion, the Court relies upon its above analysis regarding the meaning of the concept of prejudice in the revocatory action.

## V. The Interface between the Louisiana Revocatory Action and the Bankruptcy Code.

■ Having explored the purpose of and legislative history underlying the Louisiana revocatory action, the Court now will explore the interface between the Louisiana revocatory action and the Bankruptcy Code. As mentioned, under the authority of section 544(b) of the Bankruptcy Code, the Trustee has brought a Louisiana revocatory action, pursuant to La.Civ.Code art.2036, against Boatmen's and Richardson. Section 544(b) of the Bankruptcy Code provides as follows:

**Section 544. Trustee as lien creditor and as successor to certain creditors and purchasers**

\*\*\*

(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.[63]

The Notes of the Committee on the Judiciary, Senate Report No. 95–989, U.S.Code Cong. & Admin.News 1978, pp. 5787, 5871, which follow this provision, state as follows:

**62.** *See* the Stacy Trust Memorandum in Support of Motion for Summary Judgment, filed August 18, 1995, at 13.

**63.** 11 U.S.C. section 544(b) (1984).

Subsection (b) is derived from current section 70e [former section 110(e)) of this title]. It gives the Trustee the rights of actual unsecured creditors under applicable law to void transfers. It follows *Moore v. Bay*, 284 U.S. 4, 52 S.Ct. 3, 76 L.Ed. 133 (1931) [52 S.Ct. 3, 284 U.S. 4, 76 L.Ed. 133, 18 Am.Bankr. Rep.N.S. 675], and overrules those cases that hold section 70e [former section 110(e) of this title] gives the trustee the rights of secured creditors.[64]

As the Historical Notes indicate, section 544(b) of the Bankruptcy Code was derived from section 70e of the Bankruptcy Act, which provided as follows:

> The trustee may avoid any transfer by the bankrupt of his property which any creditor of such bankrupt might have avoided, and may recover the property so transferred, or its value, from the person to whom it was transferred, unless he was a bona fide holder for value prior to the date of the adjudication. Such property may be recovered or its value collected from whoever may have received it, except a bona fide holder for value. For the purpose of such recovery any court of bankruptcy as defined in this title, and any State court which would have had jurisdiction if bankruptcy had not intervened, shall have concurrent jurisdiction.[65]

Section 70e of the Bankruptcy Act, however, did not answer the question of *to whose benefit* the trustee's avoidance power would inure: *all* the unsecured creditors, or only those creditors which could have brought such a cause of action? In answer to this thorny question, the Court now turns to *Moore v. Bay*, which is cited in the Historical Notes following section 544(b) of the Bankruptcy Code, and to *In*

*re Sassard & Kimball, Inc.*, 45 F.2d 449 (9th Cir.1930), which was reversed on appeal in *Moore v. Bay*.

In *Sassard*, the Ninth Circuit affirmed the lower court, which had reversed a ruling of the referee in bankruptcy holding a certain chattel mortgage void as to all creditors. Sassard & Kimball, Inc., a corporation engaged in the business of a merchant selling automobile parts and accessories, had filed a voluntary petition in bankruptcy on December 31, 1929, and on the same date the receiver for Sassard & Kimball took into his possession all property claimed to be a part of the estate, including that property covered by a certain chattel mortgage at issue. On November 23, 1928, the bankrupt had executed a chattel mortgage as security for the payment of a certain promissory note for $10,000, payable thirty days after date to the assignor of the lender. The mortgage was acknowledged of date on November 30, 1928, the affidavit of good faith was executed on December 5, 1928, and the instrument was filed for record and recorded by the county recorder of Los Angeles county on December 19, 1928. The chattel mortgage covered a Studebaker service car, a Ford roadster, and the furniture, showroom, and shop equipment of the bankrupt. Prior to the execution or filing of the mortgage, a notice of intention to mortgage the stock in trade, fixtures, and equipment belonging to the mortgagor was not recorded in accordance with California law. With regard to the mortgage, three classes of creditors were presented: (1) those creditors existing on the date of the mortgage; (2) those creditors who became such between the date of the mortgage and its recordation; and (3) those

---

**64.** H.R.Rep. No. 595, 95th Cong. 1st Sess. 370 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6326.

**65.** 11 U.S.C. section 110(e) (1898).

becoming creditors subsequent to the recording of the mortgage.

The Ninth Circuit was confronted two issues: (1) the *extent* to which the trustee could avoid a chattel mortgage; and (2) *who benefits* from the trustee's avoidance of the mortgage? The Ninth Circuit first found that under California law, the mortgage was void as to the creditors of the first and the second classes, but valid as to the creditors of the third class. The Ninth Circuit then rejected the appellant's argument that under section 70e of the Bankruptcy Act, the mortgage, being void as to one creditor or class of creditors, was void *in toto* at the suit of the trustee. The Ninth Circuit reasoned that there was no express language in section 70e which specifically granted to any unsecured creditor of a bankrupt any greater rights or any secured creditor any less right than the creditor had had before the adjudication in bankruptcy. The Ninth Circuit thus concluded that a trustee in bankruptcy was limited in his control and disposition of the estate of the bankrupt to the rights of creditors *as such rights existed and could be enforced under state law* prior to the institution of bankruptcy proceedings. Noting that under California law, only the judgment creditors of the first or second class could have successfully contested the mortgage, had bankruptcy not intervened, the Ninth Circuit affirmed the lower court's holding that section 70e of the Bankruptcy Act *did not* place each of the three classes of creditors on the same level of priority. The lower court thus had found that the trustee indeed represented all creditors, but only as their respective interests in the property were fixed by state law when the bankruptcy proceedings were instituted, and that it was the

trustee's duty to administer and distribute accordingly as he found at the time that the liens or inferiorities of the respective creditors were established. Therefore, if at that time, any creditor did not have any inchoate rights under existing state laws to reduce his claims to an existing and recorded mortgage, then such creditor was bound, in the distribution of the estate, to recognize another creditor's superior position.

In summary, with regard to the first issue, the Ninth Circuit held that the chattel mortgage could be avoided by the trustee only to the amount by which the chattel mortgage could have been avoided outside of bankruptcy (*i.e.*, under state law) by the earlier and the "gap" unsecured creditors. With regard to the second issue, the Ninth Circuit has been thought to have ruled that the trustee took the amount recovered, and held it for the benefit of *all* unsecured creditors, but the Ninth Circuit may have reached the opposite conclusion, that is, holding that the nonbankruptcy result provided by state law was to be followed in its entirety. In other words, if state law were the basis for determining rights in bankruptcy, then the amount of assets recovered by the trustee should be preserved for the benefit of the earlier and "gap" unsecured creditors, but not for the benefit of the subsequent creditors. Under this interpretation, relative nonbankruptcy rights are preserved among the unsecured creditors.[66]

*Sassard* was appealed to the United States Supreme Court in *Moore v. Bay*, which reversed *Sassard* and was delivered by Justice Holmes. In a tersely-written opinion, the Supreme Court stated the issue as follows: whether the mortgage was void also as against those who gave the

---

66. *See* Douglas G. Baird & Thomas H. Jackson, *Cases, Problems, and Materials on Bankruptcy* 337–38 (2d ed.1990); Jackson, "Avoid-ing Powers in Bankruptcy," 36 Stan.L.Rev. 725, 742–50 (1984).

bankrupt credit at a later date, after the mortgage had been recorded. Justice Holmes first focused on section 70 of the Bankruptcy Act for the proposition that "the trustee in bankruptcy gets the title to all property which has been transferred by the bankrupt in fraud of creditors, or which prior to the petition he could by any means have transferred, or which might have been levied upon and sold under judicial process against him." *Moore v. Bay,* 284 U.S. at 4, 52 S.Ct. 3.

Then, Justice Holmes focused on section 67 of the Bankruptcy Act, for the proposition that "claims which for want of record or for other reasons would not have been valid liens as against the claims of the creditors of the bankrupt shall not be liens against his estate. The rights of the trustee by subrogation are to be enforced for the benefit of the estate." Justice Holmes then cited, *inter alia, Campbell v. Dalbey,* 23 F.2d 229, 230 (5th Cir.1927), and *Globe*

*Bank v. Martin,* 236 U.S. 288, 292, 35 S.Ct. 377, 59 L.Ed. 583 (1915), for the proposition that "what thus is recovered for the benefit of the estate is to be distributed in 'dividends of an equal percentum on all allowed claims, except such as have priority or are secured.'" *Moore v. Bay,* 284 U.S. 4, 52 S.Ct. 3. *Campbell v. Dalbey,* however, suggests that the bankruptcy trustee can set aside the entire transaction, and *Globe Bank v. Martin* discusses the distributional question only, not the scope of the trustee's avoiding powers.[67]

Despite its rather obscure holding, traditional interpreters of *Moore v. Bay* have focused on Justice Holmes' reliance on section 67 of the Bankruptcy Act, and have read the case to have held that the chattel mortgage could be avoided *entirely,* so that the $10,000 recovered was an asset of the estate to be shared by *all* unsecured creditors.[68] In other words, under this

---

**67.** *See* Baird & Jackson, *supra,* at 337. *See also* Kennedy, The Trustee in Bankruptcy as Secured Creditor Under the Uniform Commercial Code, 65 Mich.L.Rev. 1419, 1421 (1967).

**68.** *See In re AOV Industries, Inc.,* 792 F.2d 1140, 1155 (D.C.Cir.1986) (Starr, C.J., concurring in part and dissenting in part); *In re Plonta,* 311 F.2d 44 (6th Cir.1962); *Miller v. Sulmeyer,* 299 F.2d 102 (9th Cir.1962); *City of New York v. Rassner,* 127 F.2d 703, 707 (2d Cir.1942); *Corley v. Cozart,* 115 F.2d 119 (5th Cir.1940); *General Motors Acceptance Corp. v. Coller (In re Thomas),* 106 F.2d 584 (6th Cir. 1939), *cert. denied,* 309 U.S. 682, 60 S.Ct. 723, 84 L.Ed. 1026 (1940). For cases which have distinguished *Moore v. Bay, see G. F. Wertime, Inc. v. Turchick,* 358 F.2d 802, 808 (2d Cir. 1966) (affirming district court's holding that the trustee was entitled to avoid the mortgage, but declining to affirm on the district court's ground, *i.e.,* that "if a transfer is voidable at all, it is voidable entirely," because to do so would "force [the court] to consider the vitality of the much criticized decision of *Moore v. Bay* "); *Dabney v. Chase Nat. Bank of City of New York,* 201 F.2d 635, 638 (2d Cir.1953) (asserting in *dicta* that *Moore v. Bay*

and section 70(e) of the Bankruptcy Act do not extend to " 'transfers,' to 'avoid' which a creditor must resort to a right, acquired by virtue of a transaction between himself and the transferee, and not between himself and the bankrupt."); and *In re American Fuel & Power Co.,* 151 F.2d 470 (6th Cir.1945). In this case, the issue before the court was whether the rejected claim of Columbia Gas & Electric Corporation to ownership of more than a third of the first mortgage bonds issued by Inland Gas Corporation, one of the corporations in receivership, could be deemed to be valid as an asset of the Trustee of Inland for the benefit of all creditors, including the debenture holders, so as to permit them to share in the security of the first mortgage. Columbia's claim had been rejected as being invalid because it was based on or arose out of illegal transactions and, therefore, was neither provable nor allowable in the bankruptcy reorganization of Inland. The court distinguished *Moore v. Bay* on the following grounds:

> None of these authorities [including *Moore v. Bay* ] is in point.... The rejected lien of Columbia was a mortgage lien created by contract [a first mortgage bond issue], and

interpretation of the case, the trustee essentially becomes the "creditor" of the estate, and the amount of money recovered inures into the benefit of that "creditor," *i.e.,* the *entire* bankruptcy estate. As a result, *all* unsecured creditors are benefitted, rather than merely the creditors which could have brought the avoidance action.[69]

The traditional reading of *Moore v. Bay* tends to upset the nonbankruptcy (*i.e.,* state) rights of some creditors. For example, if Justice Holmes had taken the assets and had distributed them among the unsecured creditors as a group (the reading conventionally favored by most commentators of *Moore v. Bay*), then the costs imposed, compared with nonbankruptcy rights, would be on the earlier creditors and the "gap" creditors (who seemed to be blameless), not on the holder of the chattel mortgage (who created the ownership problem in the first place). Under this reading, outside of bankruptcy, the holder of the chattel mortgage would lose money to the actual "gap" creditors, while inside bankruptcy, the holder of the chattel mortgage would participate, *pro rata,* in the assets the trustee would avoid under section 544(b) of the Bankruptcy Code. The conventional reading of *Moore v. Bay* thus raises the question of whether it is right, as a matter of bankruptcy policy, to allow an asset (*i.e.,* the right to avoid a property interest), to be taken from a particular unsecured creditor, or group of creditors (such as "gap" creditors), and to make this asset generally available to unsecured creditors as a class? This reading of *Moore v. Bay* may lead to incentives to resort to bankruptcy, not for the collective benefit of all interested parties, but for reasons of individual gain.[70]

*Moore v. Bay* also creates some tension with section 544(b) of the Bankruptcy Code. Under section 544(b) of the Bank-

---

not a lien obtained by attachment, judgment, levy or other equitable process, or proceedings, pursuant to Section 67 [of the Bankruptcy Act]. Section 70 of the Bankruptcy Act gives the trustee the right to attack a transfer made or an obligation incurred by a debtor adjudged bankrupt under the Act, if any one creditor may make such attack; and the recovery of the property transferred, or the cancellation of the obligation incurred, will be for the benefit of all creditors. That which passes to the trustee under Section 70 is the right of the creditor to attack the transfer or obligation. It does not follow, from this, that the trustee would, from the right granted by the Section, be subrogated to participate, in lieu of Columbia, in the security of the mortgage, upon adjudication of the invalidity of the bonds held by Columbia If any right of subrogation exists here at all, it must be derived from the general doctrine and not from the Bankruptcy Act. Certainly, there is nothing in Section 70 to indicate that the bonded indebtedness of the debtor to Columbia must or can kept alive for the benefit of the creditors of the debtor, after cancellation as to Columbia.

*Id.* at 479.

**69.** Other commentators, such as J. MacLachlan, one of the principal drafters of the 1938 amendments to the Bankruptcy Act, have focused on Justice Holmes' reliance on section 70 of the Bankruptcy Act, and have criticised the case for the reason that there really were two issues before the Court, neither of which Justice Holmes adequately addressed: (1) whether the trustee in bankruptcy could appropriate all the mortgaged property or whether his right to attack it was measured by the claims of creditors who could attack it. (2) Assuming that his recovery was the more the more limited one (as all previous cases had assumed), was his recovery to inure only to the direct benefit of the creditors who could attack or did it become a general asset of the estate? *See* J. MacLachlan, Handbook of the Law of Bankruptcy 330–31 (1956). *See also* McCoid, Moore v. Bay: An Exercise in Choice of Law (1990).

**70.** *See* Baird & Jackson, *supra,* at 340–41.

ruptcy Code, the trustee may be able to avoid *transfers* that a creditor could attack, but the trustee may not be able to bring an action for *damages* that creditors might have brought, even if the goal of an avoidance action from the perspective of creditors is identical, namely, to be repaid.[71] The argument, of course, against giving the trustee the right to bring damage actions is that the trustee would take a damage recovery that belonged to a few creditors outside of bankruptcy and would share the recovery among all the creditors in bankruptcy.

The Court's discussion of *Moore v. Bay* is necessary because section 544(b) of the Bankruptcy Code and the apparent holding of *Moore v. Bay* preempt contrary state law. More to the point, the Louisiana revocatory action, as has been seen, inures to the benefit of the creditor who has brought the action, and not all unsecured creditors, but section 544(b) of the Bankruptcy Code and *Moore v. Bay*, as also has been seen, establish as a matter of federal bankruptcy law that an action brought under section 544(b) inures to the benefit of all creditors, not only the creditors who could have brought the action. In other words, if the Trustee prevails on his revocatory action, *all* creditors in this bankruptcy case will benefit, not merely those creditors which could have brought such an action.

## VI. We Look at the Louisiana Revocatory Action Against the Uniform Fraudulent Conveyances Act.

Because the Stacy Trust and Richardson have argued that the Louisiana revocatory action is limited by a "reasonably equivalent value" or "fair consideration" standard, corresponding to the "fair consideration" standard inherent in the fraudulent conveyance action at common law, the Court now will explore the interface between the Louisiana revocatory action and the Uniform Fraudulent Conveyances Act. Like the *Actio Pauliana* under Roman law, the common law also developed a means for combating fraud on creditors, but, as will be seen, the common law imbued this means with the notion of "fair consideration," while, as has been seen, Roman law pointedly *did not*.

It is frequently thought that the common law's version of the *Action Pauliana*, namely, the Uniform Fraudulent Conveyances Act, 7A U.L.A. 427 (1918),[72] can be traced back to the Statute of 13 Elizabeth, promulgated by Parliament in 1571,[73] the purpose of which was to make illegal and void any transfer made for the purpose of delaying, hindering, or defrauding creditors.[74] However, as Professor Frank Kennedy, the reporter for the Uniform Fraudulent Transfer Act, has observed, English legislation directed at fraudulent transfers

---

**71.** *See Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972). When Congress passed the Bankruptcy Code in 1978, Congress considered adding a subsection to section 544(c) which would have overruled *Caplin* and would have modified the impact of *Moore v. Bay* by providing that " '[a]ny recovery by the trustee ... shall be for the benefit only of such creditors' as could have brought an action on such cause of action." Congress, however, dropped this provision, suggesting that *Caplin* remains good law. *See* Baird & Jackson, *supra,* at 343.

**72.** In 1918, the National Conference of Commissioners on Uniform State Laws proposed the UFCA, drafted principally by Professor Samuel Williston. The UFCA was adopted in twenty five states and in the Virgin Islands. 7A U.L.A. 427 (1985).

**73.** Almost every jurisdiction in the United States has either recognized the Statute of 13 Elizabeth as part of common law, or has enacted a statute in similar terms.

**74.** *See, e.g., Credit Managers Ass'n v. Federal Co.,* 629 F.Supp. 175, 179 (C.D.Ca.1985).

had been enacted by Parliament during the preceding two centuries.[75] Moreover, as Professor Garrard Glenn, one of the foremost authorities on fraudulent transfers, has noted, the Roman law terms "in fraud of creditors" and "with intent to defraud," "found their way with monotonous regularity, into English statutes long before the Act of Elizabeth was drafted."[76]

The purpose of section I of the Statute of 13 Elizabeth was declared to be for "Avoiding and Aboli[sh]ing ... Conveyances ... Judgments and Executions, as well of Lands and Tenements as of Goods and Chattels, ... devi[s]ed and contrived ... to the End, Purpo[s]e, and Intent, to delay, hinder or defraud Creditors."[77] This phrase, more or less, appeared in colonial enactments in the United States, the statutory or common law of each state, the UFCA, the UFTA, and every federal bankruptcy act.[78] The Statute of 13 Elizabeth was originally enacted as a "State measure, for the uses of the Crown,"[79] and became the "prime remedial measure of use to creditors aggrieved by their debtors' fraudulent disposition."[80]

Despite its penal character, the Statute of 13 Elizabeth became the basis for the development of the creditor's remedy against fraudulent transfers, both by rendering such transfers voidable and by protecting transfers "upon good consideration and bona fide lawfully conveyed."[81] Nevertheless, though the statute appropriately recognized that the basis for avoidance should be the transfer's effect upon the debtor's estate, even the earliest cases applying the statute recognized that fraudulent intent rarely was amenable to direct proof, and that the statute's reach should not be limited to particular forms of transfers.[82] Therefore, cases as far back as 200 years avoided certain transfers as being fraudulent, without regard to the evidence of the transferor's actual intent.[83]

The difficulty that courts and legislatures faced for hundreds of years with regard to defining specifically what kinds of transactions hindered, delayed, or defrauded creditors led the common-law judges to develop *per se* rules, called "badges of fraud," which would permit the

75. *See* Frank R. Kennedy, "Symposium on Fraudulent Conveyance: Involuntary Fraudulent Transfers," 9 Cardozo L.Rev. 531, 536 (1987). *See also* 19 Hen. 7, ch. 15 (1503); 3 Hen. 7, ch. 4 (1486); 3 Rich. 2, ch. 3 (1379); 50 Edw. 3, ch. 6 (1376).

76. *See* 1 Garrard Glenn, Fraudulent Conveyances and Preferences, section 60, at 83; *see also* Kennedy, *supra,* at 536.

77. *See* 13 Eliz., ch. 5, section I (1570). *See also* Kennedy, *supra,* at 536–37.

78. *See* Glenn,*supra,* section 58, at 79–81; Glenn,"A Study in the Development of Creditors' Rights," 14 Colum.L.Rev. 279, 287 (1914); Kennedy, *supra,* at 537.

79. *See Twyne's Case,* 76 Eng.Rep. 809 (Star Chamber 1601).

80. *See* Kennedy, *supra,* at 537; *see also Mannocke's Case,* 73 Eng.Rep. 661 (K.B.1571).

81. *See* 13 Eliz., ch. 5, section VI (1570); *see also* Kennedy, *supra,* at 537.

82. *See Twyne's Case,* 76 Eng.Rep. 809 (Star Chamber 1601); Kennedy, *supra,* at 538.

83. *See, e.g., Townsend v. Windham,* 28 Eng. Rep. 1 (Ch.1750) ("A man, actually indebted, and conveying voluntarily, always means to be in fraud of creditors."); *Reade v. Livingston,* 3 Johns. Ch. 481, 500, 1818 WL 1934 (N.Y.Ch.1818) (by Chancellor Kent: "[I]f the party be indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts, and no circumstance will permit those debts to be affected by the settlement, or repel the legal presumption of fraud. The presumption of law, in this case, does not depend upon the amount of the debts, or the extent of the property in settlement, or the circumstances of the party."). *See also* Kennedy, *supra,* at 539.

courts to consider a transaction as a fraudulent conveyance, even though no specific evidence suggested that the debtor attempted to profit at the creditor' s expense.[84] One example of a "badge of fraud" is when an insolvent debtor sells property but retains possession of it, without any special reason such as the need to complete unfinished goods; in such a case, common law judges would infer that such a debtor "was up to no good."[85]

The draftsmen of the UFCA intended to make the law of fraudulent transfers more uniform and definite by asserting that *certain combinations* of circumstances constituted fraudulent transfers, without regard to intent *to hinder, delay, or defraud.*[86] For example, section 7 of the UFCA provides that "Every conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud . . . creditors," also was voidable by both present and future creditors.[87] Similarly, section 1 of the UFCA defined "conveyance" to include *every* transfer of property, as well as "the creation of any lien or incumbrance."[88]

According to Professor Kennedy, the UFCA:

had a profound influence on the development of the American law of fraudulent transfers, not only in establishing rules for the avoidance of constructively fraudulent transfers, but also in according standing to an unsecured creditor to commence avoidance proceedings. Additionally, it recognized the propriety of the partial avoidance of a fraudulent transfer when the transferee gave less than a fair equivalent for the property received but without actual fraudulent intent.[89]

Professor Kennedy's reference to "less than a fair equivalent for property received" can be tied to section 9(2) of the UFCA, which provided that "[a] purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment."[90] Similarly, the Statute of 13 Elizabeth and the state laws which conformed to the original statute protected the transferee who gave "good consideration" in bona fide transactions, which pro-

---

84. *See* Douglas G. Baird & Thomas H. Jackson, "Symposium on Bankruptcy: Fraudulent Conveyance Law and its Proper Domain," 38 Vand.L.Rev. 829, 830 (1985). *See also, e.g., Twyne's Case,* 76 Eng.Rep. 809, 810–11 (King's Bench 1601) (announcing six "badges of fraud"); *Philco Fin. Corp. v. Pearson,* 335 F.Supp. 33, 40–41 (N.D.Miss.1971) (applying "badges of fraud").

85. *See* Baird & Jackson, *supra,* at 830. *See also Twyne's Case,* 76 Eng.Rep. 809 (Star Chamber 1601). *Twyne's Case,* which involved a preference, is the "fountainhead" of the modern Anglo–American law of fraudulent conveyances. In this case, notwithstanding that the deed of gift of all of Pierce's goods and chattels to Twyne, in satisfaction of Pierce's debt, Pierce continued to possess the goods, and used them as his own. The court found that the transaction was not *bona fide,* and was a fraudulent retention of possession.

Unfortunately, the doctrine of fraudulent retention of possession, as birthed by *Twyne's Case,* later plagued the development of the law governing security interests in personal property which the debtor retained. *See* Kennedy, *supra,* at 537; Clark, "The Duties of the Corporate Debtor to its Creditors," 90 Harv. L.Rev. 505, 506 (1977); and *Miller v. Parsons,* 9 Johns. 336 (N.Y.Sup.Ct.1812).

86. *See* sections 4, 5, 6, and 8 of the UFCA, 7A U.L.A. 474, 504, 507, and 576 (1985). *See also* Kennedy, *supra,* at 539.

87. *See* 7A U.L.A. 509 (1985).

88. *See* 7A U.L.A. 430 (1985).

89. *See* Kennedy, *supra,* at 540.

90. *See* 7A U.L.A. 578 (1985).

tection appeared to be complete if the transferee sustained the burden of showing that some consideration was given in good faith.[91] In contrast to the Statute of 13 Elizabeth, which protected the transferee who *in good faith* gave "good consideration" in *bona fide* transactions, the UFCA *limited* the protection of even the good faith transferee of fraudulently transferred property by making a reference to the *value* given, thus further evidencing the draftsmen's intent to objectify the law of fraudulent transfers by providing a remedy for the *prejudicial diminution* of the debtor's property.[92]

Professors Baird & Jackson comment as follows on the necessity for the "fair consideration" or "good consideration" provision in the UFCA:

> Over the past hundred years, there has been an increasing tendency to treat transfers of property of insolvent debtors in which the debtor received nothing or too little in return as fraudulent conveyances. The Uniform Fraudulent Conveyance Act, for example, contains a separate section that deems a transfer by an insolvent debtor made for less that " 'fair consideration' " to be a fraudulent conveyance. [*quoting* section 4 of the UFCA, 7A U.L.A. 205 (1918).] The most straightforward justification for this provision is the same as the justification for the Statute of 13 Elizabeth: it is a rule designed to set aside transfers by an insolvent debtor that are intended to hinder, delay, or defraud his creditors. This approach presumes mischief when an insolvent debtor voluntarily transferred property and got nothing or clearly too little in return unless the debtor simply was paying off an antecedent debt. Because it is a per se rule, it may treat some transactions in which a debtor was not trying to hinder, delay or defraud his creditors as fraudulent conveyances. The number of cases in which an insolvent debtor gives away something for nothing but is not trying to hinder, delay, or defraud his creditors, however, may be sufficiently small that it is preferable to treat all these cases as fraudulent conveyances. The benefits of a rule may warrant its supplementing the standard. The costs to society of setting aside legitimate transfers should be offset by the elimination of costs associated with proving actual fraudulent intent in cases in which the chances of fraud are very high.[93]

The law of fraudulent *transfers* (in contrast to fraudulent *obligations*) deals with property transferred by a debtor who, but for the transfer, could have satisfied the claims of the debtor's creditors. The transfer is a "fraudulent transfer" if the property was transferred to defeat the creditors' rights, or was made under circumstances deemed to be fraudulent.[94] As Professor Glenn has noted:

> The creditor's right . . . is to realize upon all property that is capable of conversion into money or distribution. In other words, the creditor should be able to reach whatever is available to the debtor. Now, the kind of wrongdoing

91. *See* 13 Eliz., ch. 5, section VI (1570). *See also* Kennedy, *supra*, at 580, n. 44.

92. *See* Kennedy, *supra*, at 580, n. 44. *See also* J. MacLachlan, Handbook of the Law of Bankruptcy 274 (1956).

93. Baird & Jackson, "Symposium on Bankruptcy: Fraudulent Conveyance Law and its Proper Domain," 38 Vand.L.Rev. 829, 830–31 (1985).

94. *See* Gerald K. Smith and Frank R. Kennedy, "Symposium on Bankruptcy: The Trustee's Avoiding Powers: Fraudulent Transfers and Obligations: Issues of Current Interest," 43 So.Car.L.Rev. 709, 709 (1992).

that is known as a fraudulent conveyance consists of putting realizable assets beyond the reach of the creditor's process, whatever form that process may take.[95]

With regard to the *remedies* available to creditors who fall victim to fraudulent conveyances, the law of fraudulent *obligations* differs from the law of fraudulent *transfers*. A fraudulent *obligation* is an obligation which is created to defeat the creditors' rights, or is made pursuant to circumstances which are deemed to be fraudulent.[96] The creditors' remedy for a fraudulent obligation is to invalidate the obligation, while the creditors' remedy for fraudulent transfers is to "recapture ... the property from the fraudulent grantee or from a sub-grantee who took gratuitously or paid value with notice."[97] According to Professors Smith and Kennedy, these remedies are not equivalent:

> The remedy for fraudulent obligations is always adequate. However, the remedy for fraudulent transfers is often inadequate because the initial transferee either transfers or consumes the property and is impecunious. To the extent the property itself cannot be recovered, the creditor is allowed to recover the value of the property from 'any guilty person through whose hands the asset may have passed.' [*quoting* 1 Garrard Glenn, Fraudulent Conveyances and Preferences, section 56, at 7 (rev. ed.1940).] But, according to Professor Glenn, it is generally not possible to recover from those who aided, participated in, or conspired to effect the fraudulent transfer because the general creditor plaintiff

has no property interest in the assets of the debtor. However, Professor Glenn views the rule as different after judgment: 'The meddling outsider becomes liable under principles that are easy to understand, but they do not flow directly from the Statute of Elizabeth or any modern substitute.' [*quoting* Professor Glenn, Fraudulent Conveyances and Preferences, section 56.] By the time of the revised edition of Professor Glenn's famous treatise, there was a clear-cut basis for recovery from those who aided, participated in, or conspired to effect an intentionally fraudulent transfer. Section 870 of the Restatement of Torts, promulgated in 1939, assigned liability to anyone who intended the consequences of his or her acts. This rule was more clearly expressed in 1977 in section 870 of the Second Restatement of Torts, which provided that " '[o]ne who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances.' " The section was intended to serve as a guide for determining when liability should be imposed for harm that was intentionally inflicted, 'even though the conduct does not come within the requirements of one of the well established and named intentional torts.'[98]

By the time half the states had enacted the UFCA, with minor variations, the Uniform Fraudulent Transfer Act ("UFTA"), drafted principally by Professor Kennedy, was approved in 1984 by the National Conference of Commissioners on Uniform

---

95. 1 Garrard Glenn, Fraudulent Conveyances and Preferences, section 1, at 2 (rev. ed.1940).

96. *See* Smith & Kennedy, *supra,* at 709.

97. *See* Glenn, *supra,* section 56, at 77. *See also* Smith & Kennedy, *supra,* at 709.

98. Smith & Kennedy, "Symposium on Bankruptcy: The Trustee's Avoiding Powers: Fraudulent Transfers and Obligations: Issues of Current Interest," 34 So.Car.L.Rev. 709, --- (1992).

State Laws and was recommended to the states for adoption in place of the UFCA. The UFTA was drafted with the goal of aligning state law with section 548 of the Bankruptcy Code, but this goal has not been entirely achieved, and there remain some significant differences between section 548 and corresponding UFTA provisions in states which have adopted the UFTA.[99]

Although section 544(b) of the Bankruptcy Code arms the trustee in bankruptcy with the power to succeed to the rights of actual creditors to set aside fraudulent conveyances, section 548 of the Code provides the trustee with a special power to set aside fraudulent conveyances. Section 548 provides, in pertinent part, as follows:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> ***

received less than a *reasonably equivalent value* in exchange for such transfer or obligation.[100]

The scope of section 548 and of the UFCA are relatively parallel, and it is likely that most transfers which a trustee seeks to set aside under section 548 likewise could be set aside under section 544(b), through the UFCA. Section 548 and the UFCA differ, however, in that section 3 of the UFCA utilizes not a "reasonably equivalent value" test, but a "fair consideration" test,[101] which incorporates a "good faith" requirement not appearing in section 548 of the Bankruptcy Code. Section 548's "reasonably equivalent value" test, however, is broad enough to include much of the "fair consideration" requirement of the UFCA.[102] The UFTA has followed the Bankruptcy Code and has replaced the concept of "fair consideration" with that of "reasonably equivalent value," both of which concepts dispense with the "good faith" requirement of the UFCA.[103]

The Court pointedly observes that, unlike the *Actio Pauliana*, which *never* incorporated a "reasonably equivalent value" or

---

99. *See generally* Kennedy, *The Uniform Fraudulent Transfer Act*, 18 U.C.C.L.J. 195 (1986); 4 *Collier on Bankruptcy* paragraph 548.01 at 548–8 (15th ed.1995).

100. 11 U.S.C. section 548(a)(2)(A) (1994) (emphasis added).

101. Section 3 of the UFCA provides as follows:

> Fair consideration is given for property, or obligation,
> (a) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> (b) When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

7 U.L.A. section 3.

102. Indeed, section 67d of the Bankruptcy Act, a precursor of section 548 of the Bankruptcy Code, utilized a "fair consideration" test which was strikingly similar to the UFCA "fair consideration test," and which defined "fair consideration" as follows:

> [C]onsideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.

11 U.S.C. section 67d(1)(e) (1898).

103. *See* 4 *Collier on Bankruptcy* paragraph 548.01 at 548–13, n. 12.

"fair consideration" test, but instead was was a *restitutio in integrum* and to this day remains as such, the common law *did* incorporate a "fair consideration" limitation in the UFCA, and section 548 of the Bankruptcy Code similarly has incorporated a "reasonably equivalent value" test. Moreover, the Court notes that the UFCA was promulgated in 1918, *well after* the codification of the revocatory action in the Louisiana Civil Code of 1808 and literally thousands of years after the birth of the original *Actio Pauliana.*

Therefore, it makes absolutely no sense for the Stacy Trust or for Richardson to argue that the revocatory action, which eminently preceded the UFCA, should somehow adhere to the "fair consideration" requirement of the UFCA or to the "reasonably equivalent value" test of section 548 of the Bankruptcy Code. It *is* true that Comment (c) to Article 2036 of the Code remarks that the "revocatory or Paulian action, an institution derived from Roman law, is the civil law *analogue* to the common law suit to set aside a fraudulent conveyance" (emphasis added). An analogue, however, is merely that which "bears some resemblance or likeness," [104] and certainly *is not* that which is *identical* to the object to which the analogue is being compared. As has been noted, the purposes of the *Actio Pauliana* and the common-law fraudulent conveyance action were strikingly similar, but it can be said with great certainty that one of the *means* by which these provisions yielded their goals was strikingly different: the *Actio Pauliana* utilized a restitutionary-type of "dollar-for-dollar" measure of prejudice, while the UFCA utilized a "fair consideration" test. Perhaps as a practical matter, the two tests differed little in real cases, but it cannot be said that the tests thereby were identical. Had the Louisiana legislature wished to invoke a "reasonably equivalent value" test in Article 2036 of the Louisiana Civil Code, the legislature easily could have done so. The fact that the legislature chose not to do so establishes for this Court the entitlement of the trustee to relief.

## CONCLUSION

The Court has examined Civil Code Article 2036, the Louisiana revocatory action, in detail. Both the plain meaning of the phrase "increased the obligor's insolvency," as well as the legislative history and purpose of the Louisiana revocatory action, indicate without a doubt that the measure of prejudice to a creditor bringing such an action must be by a "dollar-for-dollar" test, rather than by a "reasonably equivalent value" test. Accordingly, Judgment granting the Motion for Summary Judgment of the Trustee upon the § 544(b) action and denying the Motions for Summary Judgment of the Stacy Trust and of Richardson were correct to the extent of the $45,000 cash payment. However, reconsideration is warranted regarding the $18,000 difference between $45,000 and $63,000, for the Court finds that the relief should take the form of avoidance of the owner financing obligation and not recovery of a money judgment. Though the insolvency of Goldberg was increased by the incurrence of the obligation, repayment would provide the Goldberg trustee with double recovery. The Judgment will be re-formulated and rendered to award the trustee $45,000 plus pre-and post-petition interest, and to avoid $18,000 of the claim of the trust against the estate. A separate Order will issue.

---

104. *See* Black's Law Dictionary 77 (5th ed.1979).